[No. 969-2.    Division Two.    February 10, 1975.]

THE STATE OF WASHINGTON, *Respondent*, v. HAROLD BERNARD SMITH, *Appellant*.

J. *Dean Morgan, Public Defender,* and *Michael Hicks, Assistant,* and *Jack E. Tanner,* for appellant (appointed counsel for appeal).

*James E. Carty, Prosecuting Attorney,* and *George O. Darkenwald, Chief Criminal Deputy,* for respondent.

ARMSTRONG, C.J.—Harold Bernard Smith's appeal from a conviction of first-degree murder raises several issues, three of which warrant detailed discussion: (1) whether the warrantless search and seizure of Smith's clothes, placed in an anteroom outside his hospital room, was reasonable; (2) whether the State established a prima facie case of the corpus delicti; and (3) whether the verdict was supported by substantial evidence. We hold that the items seized were properly admitted because the search was consented to by the hospital which had joint control of them, that a prima facie case of the corpus delicti was established and that the verdict was supported by substantial evidence. We also reject the other challenges to the proceedings in the trial court and therefore affirm.

Only a brief recital of the facts is necessary at this point; the facts surrounding each issue will be set forth during its discussion. Around 12 midnight on July 30, 1972, Smith left

his home and took his 2½-year-old son for a walk. When his wife, Kathy Smith, awoke the next morning, they had not returned. At approximately 7:15 a.m. Smith returned home alone. He was acting strangely and to his wife's inquiries about their son, he made inconsistent statements. Kathy Smith telephoned his parents, who went to their son's house and drove him to the hospital, where he was admitted. The elder Smiths had called the police, who went to the Smith house and with Kathy Smith began to search for the boy. She found him in a stream which ran close to their home. He was dead at that time. An autopsy determined that death was caused by drowning.

I. *Search and Seizure.* Smith challenges the admission of the clothing which he wore on the evening and morning in question and which were seized without a warrant under the following circumstances. Pursuant to the telephone call from the elder Smiths, Sheriff's Deputy Gary Lentz went to the younger Smith's home about 8:20 a.m. on the morning in question. He was informed by the elder Smiths and Kathy Smith that the child had been missing since the night before when he went for a walk with his father, that there was a possibility that the child was in the stream, that Smith's clothes were wet and covered with sand, and that Smith had indicated he had been in or near the stream. Lentz, Kathy Smith, and other officers who had arrived both before and after Lentz, conducted a search for the child. After Kathy Smith found the child, Lentz observed that the child was dead, that he had some bruises on his neck and head and that his legs appeared not to be scratched by brambles as Lentz figured they probably would have been had the child gone to the stream of his own volition. Lentz attempted to calm Kathy Smith, and called for an ambulance. Fifteen minutes after the ambulance arrived and based on what he had learned, Lentz went to Vancouver Memorial Hospital where Smith had been taken. After determining that Smith was no longer in the emergency room he learned from the information desk that

he was on the third floor. Lentz proceeded to the nursing station on the third floor, arriving about 10:20 or 10:30 a.m. and learned Smith's room number. Upon determining from the ward clerk that Smith's clothes were at the hospital he requested them. She retrieved for him a pair of pants, a jacket, a pair of shoes and a pair of socks. He signed a receipt for them and took them to the police station. The sand extracted from the clothing was anlayzed by an expert from the Federal Bureau of Investigation laboratory, who testified as to his findings at trial. Lentz testified at trial as to the wet condition of the clothes when he removed them from the hospital.

At the time Lentz arrived on the third floor, Smith had been placed in room 320, a security room. The room itself contained a bed, nightstand, two windows, both of which were well screened, and two doors. One door led to a bathroom which contained a sink, stool and shower stall. There were no other doors leading into the bathroom. On the same wall of the security room and just to the left of the door leading to the bathroom was another door. It had a small window in it and led to an anteroom. This door was usually locked, though no one testified as to its being locked when Lentz was on the floor. On the anteroom wall opposite the door into the security room was a door which opened onto a main hallway. In the anteroom was a sink where doctors and nurses working in both the main room and other hospital rooms sometimes washed up. It was rarely used by patients, and was considered more a part of the hallway than the security room. In a cabinet in the anteroom were stored extra pajamas and towels for the patient in the main room. Also in the anteroom was a closet. It was in this closet that the clothes of the patient assigned to room 320 were kept including Smith's. The clerk retrieved the clothes from this closet for Lentz.

We are persuaded that no warrant was required here; the search was justified on the basis of consent given by one in joint control. It is clear that

Where two persons have equal right to the use or occu-

pancy of the premises, either one can authorize a search and the evidence thus seized can be properly admitted into evidence against either or both parties.

*State v. Bellows*, 72 Wn.2d 264, 268, 432 P.2d 654 (1967). Joint control occurs where the area searched is jointly occupied. *State v. Bellows, supra* (joint occupancy of motel room); *State v. Rye*, 2 Wn. App. 920, 471 P.2d 96 (1970) (joint occupancy of a residence), 31 A.L.R.2d § 6, at 1078 (1953). There may be joint control through joint use of an item. *Frazier v. Cupp*, 394 U.S. 731, 22 L. Ed. 2d 684, 89 S. Ct. 1420, 1425 (1969) (two persons jointly used a duffel bag). Most analogous to the case at bar are cases in which the defendant has exclusive control over some area (such as his apartment) but has joint control with another over common areas of the building or grounds. *E.g., United States v. Mojica*, 442 F.2d 920 (2d Cir. 1971) (joint control with brother of basement in house occupied by both, there being no indication that the defendant had exclusive control of the basement); *Commonwealth v. Connolly*, 356 Mass. 617, 255 N.E.2d 191 (1970), *cert. denied*, 400 U.S. 843 (1970) (all tenants have joint control of basement which was common area and freely available to all tenants); *State v. Breckenridge*, 4 Wn. App. 328, 481 P.2d 26 (1971) (though occupier of residence had given defendant right to use the garage, since occupier retained right to use the garage he was in joint control). Especially apposite to the case at bar is *People v. Manning*, 239 Cal. App. 2d 416, 49 Cal. Rptr. 433 (1966). In that case, the police went to the defendant's apartment building based on a tip that contraband was stored in a closet in the hallway. On discovering that the closet was locked, the police requested that the manager open it, which she did. Though most of the items in the closet belonged to the defendant, the manager, her husband and the defendant each had a key to the closet. The court distinguished the case from the situation where a manager lets the police into a private apartment of a defendant, and held that the manager's consent was valid because she had joint control of the closet.

■ We hold that where a patient in the hospital turns over his clothes to a representative of the hospital, such as a staff member, and allows them to be placed in a common area outside the room to which he is assigned, he has relinquished exclusive control over them. The hospital, therefore, has at least joint control and may consent to their search and seizure. The record in the case at bar established that doctors and nurses, as well as the ward clerk who actually obtained the clothes, had free access to the area for a variety of uses. Though the anteroom was the only connection between Smith's room and the hallway, it was considered more a part of the hall. In fact, it seems likely that it was used as a buffer between the security room and the outside. This evidence was not controverted and there was no evidence that Smith did not freely acquiesce in the placing of his clothes in a common area and having the door locked between him and his clothes. For all he knew they were being taken to a place in the hospital far from his room and open to anyone. Smith made no attempt to conceal his clothes from public scrutiny, as contrasted, for instance, to one who hands over to a shipper a sealed case as in *Corngold v. United States*, 367 F.2d 1, (9th Cir. 1966). *Corngold* was distinguished in *Clarke v. Neil*, 427 F.2d 1322 (6th Cir. 1970), *cert. denied*, 401 U.S. 941 (1971). There the police had learned that the defendant had taken a suit, worn on the night of the crime, to the cleaners. They went to the establishment, and the manager consented to the search and seizure of the clothes. The court found that the defendant had made no effort to preserve as private the clothes or anything on them which could be found in cleaning, as contrasted to *Corngold* where the sealing of the packages indicated the intent that no one look inside. Smith's actions are analogous to those of the defendant in *Clarke v. Neil, supra. See also People v. Misquez*, 152 Cal. App. 2d 471, 313 P.2d 206 (1957) (babysitter was in joint control when upon being arrested, defendant gave her a key to his apartment, probably so that

726

she could care for his children); cf. *State v. Edwards*, 5 Wn. App. 852, 490 P.2d 1337 (1971) (defendant had no reasonable expectation of privacy in suitcase deliberately left at his friend's father's house).

■■ II. *Corpus Delicti*. Smith contends that the State failed to prove a prima facie case of the corpus delicti. The corpus delicti in a homicide case consists of (1) the fact of death and (2) the responsibility of a criminal agency for the death. It does not include a causal connection between the death and the accused. It may be established entirely by circumstantial evidence. At trial, the State is required to present *prima facie* proof of the corpus delicti before the case may go to the jury. The prima facie case must be shown by evidence independent of any statements and admissions of the defendant. If such a case is shown, the matter may be submitted to the jury who must decide, based upon both the independent proof and any statements of the defendant, whether the commission of a crime, the identity of the perpetrator and the elements of the crime have been established *beyond a reasonable doubt. State v. Lung*, 70 Wn.2d 365, 370, 423 P.2d 72 (1967); *State v. Meyer*, 37 Wn.2d 759, 226 P.2d 204 (1951); *State v. Zuercher*, 11 Wn. App. 91, 521 P.2d 1184 (1974); 3 C. Torcia, *Wharton's Criminal Evidence* § 691 (13th ed. 1973). There is no question but that the first element of the corpus delicti, the fact of death, was established. One of the officers who searched for the boy testified that he was dead when found. The pathologist who performed the autopsy testified that he had died somewhere between midnight and the time he was found.

We have also concluded that prima facie evidence was presented on the second element of the corpus delicti—the responsibility of a criminal agency. As stated above, Smith's statements and admissions are not to be considered at this stage. Smith took his young son for a walk about midnight. Although Kathy Smith testified that she did not think at the time that there was anything unusual about them taking a walk at such a late hour, she did not say how

many time previously, if at all, such conduct had occurred. The child was in good health at the time.

The home the Smiths were occupying was located in an isolated area. The stream in which the boy drowned ran near the back of the house. The area surrounding the stream was heavily wooded, and the banks contained dense brush, making access to the stream difficult in places. The place in the stream where Kathy Smith found the boy was shown by her testimony that when she walked out of the stream, one of her slippers stuck in the mud and was left behind. The officers testified as to the location of the slipper. Immediately after the child was found, the officers conducted an investigation of the scene. Their measurements determined that at the point where the child was removed from the water, the stream was only about 8 inches deep in the center, decreasing to 1 inch at the edges. Several feet upstream, the water was only as deep as 12 inches. Therefore, even if he had drifted downstream somewhat, the boy was never in water over a foot deep. At the point where the body was found, his baby blanket, which he had taken with him on the walk, was hanging on debris in midstream. Directly across on the other bank, the officers found Smith's belt and 1 foot away from the belt, an indentation in the ground where someone had been sitting.

The condition of the child's body was strong indication that an assault rather than an accident had occurred. The pathologist who performed the autopsy, Dr. Blizzard, testified that there were several contusions and abrasions on the child's body. Some of the contusions were black and blue marks which were more than 2 days old. Also, however, there were several abrasions (scrapes) over his buttocks and upper part of his body. In addition, there were multiple contusions on his neck, though Dr. Blizzard could not state when they were made. Some of them were curved or straight. Dr. Blizzard testified that he had seen such marks often before and that in his opinion, they were caused by fingernails. There were other contusions in an L-shape, the source of which he could not identify.

Dr. Blizzard testified that he found an area of hemorrhage in the child's larynx. He acknowledged that the hemorrhage could have been caused by either trauma (injury from external force) or the absorption of water. In his opinion, however, trauma was the most likely explanation in this instance.

■ Smith contends that statements he made on the day of the incident were improperly admitted before a prima facie case of the corpus delicti was established. While he argues no more than that they should never have been admitted because the corpus delicti was never prima facie established, we would point out that one statement was introduced at the beginning of trial. However, the statement was short; immediately thereafter the trial judge requested the State to change the order of its witnesses and it did so. Admission of a statement before the corpus delicti is sufficiently established, if done on condition it will later be corroborated, is within the trial court's discretion and will not be reversed absent a manifest abuse of discretion. *State v. Lung, supra.* No abuse of discretion occurred here.

■ III. *Substantial Evidence.* The most recent Washington Supreme Court enunciation of the standard by which we must determine whether the evidence was substantial in a purely circumstantial evidence case such as the one at bar is found in *State v. Randecker,* 79 Wn.2d 512, 487 P.2d 1295 (1971). This court summarized the test in *State v. Braxton,* 10 Wn. App. 1, 5, 516 P.2d 771 (1973):

(1) The function of the trial or appellate court in reviewing a sufficiency question is to determine whether there is "substantial evidence" to support either the state's case or the particular element involved.

(2) In considering the evidence, we must assume the truth of the state's evidence and view it most strongly against the defendant, allowing the state the benefit of all reasonable inferences.

(3) Where the case is based entirely upon circumstantial evidence, the trial or appellate court's function is not to determine whether the circumstances are consistent only with the hypothesis that the accused is guilty. Such

determination is for the jury. The court's only function is to determine whether there is "substantial evidence" tending to establish circumstances on which a finding of guilt may be predicated.

In his brief, Smith argues that the question of whether "the factual situation is inconsistent with a reasonable hypothesis tending to establish [the defendant's] innocence" (*State v. Randecker, supra* at 523) is not exclusively for the jury where it is the facts and not the inferences from them which are in dispute. This reflects a misreading of *Randecker* and does not take account of that court's admonition that an appellate court may not weigh the evidence, but must only determine whether there is "substantial evidence."

Applying the principles of *Randecker* to the case at bar, we are convinced that there was substantial evidence that a crime had been committed, that Smith was responsible and that the intent to kill and premeditation existed.

A. *Commission of a Crime.* We have set forth above some of the evidence showing that the child's death was caused by a criminal agency. Viewing this evidence most favorably to the State, as we must do, several inferences may be reasonably drawn. The child was taken for a walk in an isolated area under circumstances which were very much out of the ordinary. The condition of the stream was such that even a 2½-year-old child would probably be able to extricate himself if he slipped in the water. Dr. Blizzard's testimony as to the fingernail marks and trauma of the larynx created the reasonable inference that the child had been choked and his head pushed under water. In addition, Smith made several inconsistent statements on the day of his son's death. On the one hand, upon his return early on the morning of the walk, Smith was asked by his wife where their son was. He replied, "He is, he is up on the hill in someone's car." She asked, "Whose car is he in?" and he replied, "In a friend's car" and not to worry. In his discussions with her, he was not making any sense and insisted

upon directing the conversation toward her rather than the missing boy. On the other hand, after his parents arrived, his father asked him, "Where is the boy?" and Smith answered, "He fell in the water." To his father's question, "Did you try to get him out?", Smith responded, "I tried to get him out but I couldn't." At the hospital, Smith appeared to be very nervous. He asked a nurse if she was going to give him any medication that would knock him out because he wanted to know what was going on at all times. At one point in the hospital he was pacing the hall, but upon seeing two state troopers come into the area, he turned around very quickly and went into the room to which he was assigned. Also in the hospital, he said to a nurse, "I think I drowned my own son, but I don't remember, I don't remember." These statements, together with the other evidence, are substantial evidence from which the jury could find beyond a reasonable doubt that a crime had been committed.

Smith maintains that the facts of the case at bar are very similar to those of *State v. Lynn*, 73 Wn.2d 117, 436 P.2d 463 (1968), and *State v. Guiles*, 53 Wn.2d 386, 333 P.2d 923 (1959). In *Lynn*, the court found that the second element of the corpus delicti—the responsibility of a criminal agency —had not been proved. The child died from a blow to the head. The defendant testified that the child had fallen from a chair while in his care. The doctors who testified opined that the injury resulted from either a fall, running into a solid object or being struck. This testimony is not nearly as strong as that given by Dr. Blizzard, who identified some marks on the child's neck as positively caused by fingernails and the hemorrhaging of the larynx as most probably caused by external force. That the defendant in *Lynn* hid with a knife when the police came for him is not nearly as strong evidence of the existence of a criminal agent as the inconsistency of Smith's conduct and statements and his admissions indicating that something other than an accident had occurred.

B. *Identity of Perpetrator.* There was also substantial evidence of the identity of Smith as the criminal agent. In addition to the inculpating statements listed above was evidence placing him in the creek. Officer Stanley, who received the pants Smith had been wearing on the evening and morning in question from Officer Lentz, testified that upon examination he found sand throughout them. Moreover, they were wet, with the area 2 inches above the knee and down wetter than the rest, indicating that Smith had stooped down in the stream. His jacket and socks were wet and had sand in them. There were dark spots on the back of the pants.

Richard Flach, a minerologist with the Federal Bureau of Investigation laboratory in Washington, D.C., testified concerning soil samples extracted by the officers at the scene and the sand extracted from Smith's clothing. He found that the sand in the clothing matched the samples of soil taken from the middle and edge of the stream. It was different than the soil extracted from points 3 and 6 feet from the edge of the stream on the side away from the house, directly across from where the blanket was hanging. Flach did state that some soil differs greatly with a short distance. Therefore, some of it could have matched other areas around the stream, samples of which he had not received.

The case at bar, then, is clearly distinguishable from *State v. Guiles, supra.* There the cause of the child's death was determined to be multiple acute blunt force injuries to the head which were not self-inflicted. The death occurred in a car at a drive-in movie with two other adults in addition to the defendant present. The court stated that there was no evidence as to who inflicted the injuries, a substantially different situation than the one before us.

■ Again relying on *State v. Guiles, supra,* Smith argues that because it was not shown that others did not have access to the area, his identity has not been sufficiently established. This argument is not well taken. First, it was shown to be an isolated area and no evidence was

presented to controvert the inference that others were not around. Second, though an opportunity to commit an act alone is insufficient, it is a factor to be coupled with other evidence in proving a case circumstantially. *State v. Randecker, supra.*

■ C. *Intent.* The rule for determining whether intent can be inferred from particular conduct was set forth in *State v. Davis,* 73 Wn.2d 271, 289, 438 P.2d 185 (1968):

> [W]here a defendant's acts are patently equivocal, criminal intent may not be inferred from the overt acts alone; however, specific criminal intent may be inferred from the conduct where it is plainly indicated as a matter of logical probability.

The act of grabbing the boy by the neck and pushing him under water is not even equivocal, let alone patently equivocal. Intent to kill is clearly indicated as a logical probability inferable from such conduct. Smith's inconsistent actions subsequent to the act are not relevant to the intent behind the act itself. *State v. Huff,* 76 Wn.2d 577, 458 P.2d 180 (1969).

■ D. *Premeditation.* Although no definite motive was proven, the jury was presented with substantial evidence of the existence of premeditation. The Smiths had discussed separation, though at the time of the incident had decided not to do so. They had concluded, however, that if they separated, Kathy Smith would receive custody of the children. For premeditation to be inferable by the jury, there must have been a period of time during which the intent to kill is deliberated. This time may be very short provided it is an "appreciable period of time." *State v. Shirley,* 60 Wn.2d 277, 279, 373 P.2d 777 (1962); *State v. Ross,* 56 Wn.2d 344, 351, 353 P.2d 885 (1960); *State v. Tikka,* 8 Wn. App. 736, 740, 509 P.2d 101 (1973). Looking at the circumstances surrounding the child's death, it is clear that an appreciable period of time did elapse. As recognized by our State Supreme Court, choking takes an appreciable time. *State v. Harris,* 62 Wn.2d 858, 385 P.2d 18 (1963); *State v.*

*Gaines,* 144 Wash. 446, 258 P. 508 (1927), *cert. denied,* 277 U.S. 81, 72 L. Ed. 793, 48 S. Ct. 468 (1928).

Smith has presented several other assignments of error. One challenges the giving of an instruction stating that homicide proven beyond a reasonable doubt is presumed to be murder in the second degree and that the defendant may be convicted of murder in the first degree only if the State has proven the elements of first degree beyond a reasonable doubt. This instruction was specifically approved in *State v. Mays,* 65 Wn.2d 58, 395 P.2d 758 (1964), *cert. denied,* 380 U.S. 953 (1965).

We have thoroughly reviewed the other contentions and find them to be without merit.

The judgment is affirmed.

PEARSON and PETRIE, JJ., concur.

Petition for rehearing denied March 31, 1975.

Review granted by Supreme Court September 26, 1975.