[No. 1593-2.    Division Two.    January 5, 1976.]

THE STATE OF WASHINGTON, *Respondent*, v. RANDY GORDON LUOMA, *Appellant*.

*Bernard J. Heavey, Jr.*, and *Robert W. Garver, Jr.*, for appellant.

*Robert K. Leick, Prosecuting Attorney*, and *Grant E. Hansen, Deputy*, for respondent.

PEARSON, J.—Defendant, Randy G. Luoma, was convicted of first-degree murder. On appeal, Luoma challenges (1) the sufficiency of the evidence, (2) the admission into evidence of statements made by him to police officers, (3) the admission into evidence of blood stains found on his car door, and (4) the failure of the trial court to grant a new trial because of alleged prosecutorial and juror misconduct.

We agree with certain of defendant's arguments and accordingly we reverse and remand for a new trial.

The defendant, who was 17 years of age at the time of the homicide, lived at the residence of Glenda Emerson in Home Valley, Washington. Glenda Emerson was the mother of the victim, 5-year-old Shannon Emerson. Defendant, who was unemployed and not in school, had been caring for Shannon while her mother worked. At about noon on May 28, 1974, defendant informed Glenda Emerson that Shannon was missing. Authorities were notified, a search was conducted, and later in the day Shannon's body was found face down in a marshy culvert below the Nelson Creek Road bridge, some 5 miles from the Emerson home. A large rock was resting on Shannon's head, and she was clutching uprooted grass in her hands. Pathologists testified that death occurred in the late morning or possibly the early afternoon of May 28, 1974, and that Shannon died in the culvert of blows inflicted from a flat, blunt instrument.

At three in the afternoon of May 28, 1974 (prior to the discovery of Shannon's body), defendant was taken to sher-

iff's headquarters, informed of his rights as set forth in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), and questioned briefly. In the evening of the same day, after the discovery of Shannon's body, defendant was arrested, again taken to the sheriff's office, and *Miranda* warnings were read. A short while after questioning began, a juvenile officer arrived and told Luoma that he was there to protect defendant's rights. Questioning continued in the presence of the juvenile officer and several other persons.

Defendant's account at trial of his activities during the morning of May 28, 1974, was substantially similar to that which he gave officers after his arrest. His testimony was as follows. He drove Glenda to work in the latter's white Ford Cortina, a compact car. Shannon rode along. Defendant and Shannon then drove to a nearby mill, where defendant inquired about a job. From there they went home, arriving between 7 and 7:30 a.m. Defendant maintains they remained there for the next several hours, so Shannon could watch morning television shows. He recalled that after the "Brady Bunch" was over at 11 a.m., Shannon went outside to play, and he drove to get the mail. He testified he drove past the nearby mailboxes because he was having car difficulties. Driving slowly, he crossed the Wind River bridge (a distance of about ¾ mile from home), turned around, and worked on the car for approximately 15 to 20 minutes. He returned to the mailbox and checked for mail, proceeded home, and discovered Shannon missing. Defendant asked neighbors if they had seen Shannon, and also made inquiry at a nearby grocery store. He then contacted Glenda Emerson, and a search was organized. Defendant denied being in the area of the Nelson Creek Road that day.

The portion of defendant's account of his activities prior to 7 or 7:30 a.m. is undisputed. Also, a witness who was in a boat underneath the Wind River bridge testified he saw the defendant's car moving slowly along the road above some time between 9 a.m. and 11 a.m. A neighbor, Frank

Wittenberg, testified he saw Luoma at the mailbox at about 11:20 a.m.

Other witnesses, however, sharply disputed defendant's testimony. The most damaging was the testimony of Frances Heller, who testified that at about 10 a.m. she was in her garden and observed a white compact automobile with a peculiar square back turn down Nelson Creek Road and proceed in the direction of the culvert where Shannon's body was found. She noticed the vehicle because it was noisy and moving at a high rate of speed. The car returned to the intersection about 3 minutes later and proceeded in the direction of Home Valley.

On the same day, after hearing Shannon's body had been found Mrs. Heller contacted authorities. A sheriff's deputy drove her down several streets in Home Valley and then by the Emerson residence. Upon passing the Emerson residence, Mrs. Heller spotted the Cortina in the driveway and exclaimed: "If that car is white, that's it." Mrs. Heller and sheriff's deputy testified that she had not been coached in any way.

In her testimony, Mrs. Heller rather accurately described the shirt which defendant was wearing on the day of the homicide, and, more importantly, made an in-court identification of the defendant (who was sitting in the audience) as the driver of the vehicle. Mrs. Heller maintained she had never seen the defendant before the time of her testimony, nor had she been given a photograph or a description of him.

Testimony contradicting defendant's assertion that he (and the Cortina) were at home between 7:30 a.m. and 11 a.m. on the morning in question came from two men who were loading scrap in front of the Emerson residence between 8 a.m. and 8:45 a.m. The men testified they were familiar with the Emerson Cortina, and it was not parked at the residence during that period.

The storekeeper of the grocery nearby testified defendant appeared there at 10:55 a.m., inquiring about Shannon. A coworker of Glenda Emerson testified that when defendant

arrived at the mill at noon, he told Glenda that Shannon had been missing for "a couple of hours."

In summary then, the testimony of Mrs. Heller put defendant near the spot where Shannon's body was discovered, and four other State's witnesses contradicted defendant's version of his whereabouts that morning.

We will first consider defendant's challenge to the court's pretrial ruling permitting the admission of defendant's post-arrest statements to officers. Although defendant's trial testimony was consistent with those statements, he maintains he would not have testified had the court excluded his custodial statements. Without the statements and Luoma's testimony, the testimony of several of the prosecution's witnesses would not have been impeaching.

The thrust of defendant's argument is that the police were required to insure that he, as a juvenile suspect, was aware some form of criminal adult responsibility could result from statements he made during his custodial interrogation and the record indicates this was not done. This defect, the defendant contends, vitiates the voluntariness of his waiver even though he had been properly informed of his *Miranda* rights.

The State challenges defendant's right to make this objection, since it was neither raised at trial nor at the CrR 3.5 hearing prior to trial.

As a general rule, a question raised for the first time on appeal will not be considered. *In re Richard*, 75 Wn.2d 208, 449 P.2d 809 (1969). An exception exists where the issue raised, as here, raises a question of whether the constitutional rights of a criminal defendant were invaded. *State v. Peterson*, 73 Wn.2d 303, 438 P.2d 183 (1968); *State v. McHenry*, 13 Wn. App. 421, 535 P.2d 843 (1975). We agree that the admission of defendant's statements taken on May 28 after his arrest violated his constitutional rights as a juvenile and should have been suppressed.

The defendant was arrested on suspicion of murder at approximately 8 p.m. on May 28, 1974. He was taken to sheriff's headquarters and advised of his *Miranda* rights,

which he waived. He was then questioned at the station by, or in the presence of, various law enforcement officials, including the sheriff, the prosecuting attorney, their deputies, and the juvenile officer. This was clearly a custodial interrogation, *State v. Vining*, 2 Wn. App. 802, 472 P.2d 564, 53 A.L.R.3d 390 (1970), and at no time during this questioning was the defendant told adult criminal punishment could result from the statements he made. On the contrary, as we noted above, the juvenile court officer who was present during most of the questioning told the defendant he was there to protect the defendant's rights.

*State v. Prater*, 77 Wn.2d 526, 463 P.2d 640 (1970), recognizes that statements made by a juvenile suspect to police during a custodial interrogation, if preceded by *Miranda* warnings and waiver, may be admissible in an adult criminal proceeding if it was made clear to the juvenile, either because of warnings by the police or because of the circumstances surrounding his statement, that he was involved in an adversarial situation rather than the close, noncriminal relationship which exists between juveniles and juvenile court authorities, and that criminal prosecution was possible.

While a juvenile's prior experience with law enforcement authorities may be sufficient to meet the requirements set forth in *Prater*, *State v. Davis*, 3 Wn. App. 684, 477 P.2d 44 (1970), the defendant in this case had had no such prior experience. In fact, the juvenile officer's assurance that he was there to protect Luoma's rights militates against any inference that the defendant understood the adversarial nature of the inquiry in which he was involved. We believe the statement secured by the police in these circumstances failed to meet the requirements of *State v. Prater*, *supra*, and should, therefore, not have been admitted at trial.

We believe that it is also necessary for us to consider the potential admissibility of the statement which defendant made to a deputy sheriff during the afternoon of May 28, 1974. Reference was made to this afternoon statement at the CrR 3.5 hearing, but no attempt was made to introduce

it at trial. Upon retrial, it is entirely possible an attempt to introduce the afternoon statement will be made and an issue as to its admissibility will arise.

As noted previously, the defendant voluntarily accompanied the deputy sheriff to headquarters in the afternoon and made a short statement. Prior to giving the statement, defendant was read the *Miranda* warnings but was not fully informed of his rights as a juvenile. The question is therefore whether this was a "custodial interrogation" entitling defendant to a full reading of his rights. The questioning of a suspect at a police station has been held to constitute custodial interrogation. *Proctor v. United States*, 404 F.2d 819 (D.C. Cir. 1968); *United States v. Harrison*, 265 F. Supp. 660 (S.D.N.Y. 1967). *E.g., State v. Creach*, 77 Wn.2d 194, 461 P.2d 329 (1969). But it does not follow that *all* police station questionings are custodial in nature. This is despite statements to that effect found in several cases. *See, e.g., United States v. Gibson*, 392 F.2d 373 (4th Cir. 1968); *State v. Vining, supra.*

The particular facts and circumstances of a case may compel the conclusion that statements made by a defendant while inside a police station were not made while in custody. *E.g., United States v. Fallon*, 457 F.2d 15 (10th Cir. 1972); *Fisher v. Scafati*, 439 F.2d 307 (1st Cir. 1971), *cert. denied*, 403 U.S. 939, 29 L. Ed. 2d 719, 91 S. Ct. 2256 (1971); *People v. Yukl*, 25 N.Y.2d 585, 256 N.E.2d 172, 307 N.Y.S.2d 857 (1969), *cert. denied*, 400 U.S. 851, 27 L. Ed. 2d 89, 91 S. Ct. 78 (1970); *Clark v. United States*, 400 F.2d 83 (9th Cir. 1968), *cert. denied*, 393 U.S. 1036, 21 L. Ed. 2d 581, 89 S. Ct. 654 (1969); *cf. State v. Bower*, 73 Wn.2d 634, 440 P.2d 167 (1968). *See generally* Annot., 31 A.L.R.3d 565 (1970). This is one of those cases. The defendant's afternoon statement appears to stand in an entirely different posture than the one made after his arrest. At the time it was made, the police were not investigating a crime, but merely trying to locate a missing child. The statement was made during a routine investigation which the defendant had instigated and which took place prior to the time the police had

probable cause to believe the defendant, or anyone, had committed an offense. The defendant appears to have accompanied the deputy willingly and made his statement voluntarily during a routine search for the missing child. It was not until the child's body was discovered that the police suspected his culpability, elevating the inquiries directed toward him to the status contemplated by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974, and *State v. Prater*, *supra*. Hence, we conclude that defendant's afternoon statements made to the sheriff's deputy are admissible as evidence.

We turn now to defendant's challenge to the sufficiency of the evidence. Specifically, he contends there was insufficient evidence of: (1) the corpus delicti; (2) the criminal agency of the defendant; or (3) premeditation.[1] We are not persuaded by defendant's arguments pertaining to the corpus delicti and his criminal agency. We agree, however, there was insufficient evidence of premeditation.

██ In order to evaluate the sufficiency of the evidence, the evidence must be viewed in a light most favorable to the State, allowing the State all reasonable inferences in order to determine whether substantial evidence supports every element of the State's case. *State v. Smith*, 12 Wn. App. 720, 531 P.2d 843 (1975); *State v. Braxton*, 10 Wn. App. 1, 516 P.2d 771 (1973); *State v. Randecker*, 79 Wn.2d 512, 487 P.2d 1295 (1971). In making this evaluation, we will, for the reasons already given, disregard defendant's post-arrest statements as well as his testimony at trial. We also will not consider defendant's afternoon statement because it was not introduced at trial. However, in cases based on circumstantial evidence such as this one, an appel-

---

[1] The respondent argues that defendant's challenge to the sufficiency of the evidence may not be considered on appeal because it was waived when the defendant elected to call witnesses in his own behalf. *State v. Wilson*, 74 Wn.2d 243, 444 P.2d 141 (1968). However, the defendant's motion to arrest judgment or in the alternative, for a new trial, raised again the question of the sufficiency of the evidence, and the propriety of denying this motion may be considered on appeal. *State v. Randecker*, 79 Wn.2d 512, 487 P.2d 1295 (1971); *State v. Gregory*, 73 Wn.2d 537, 439 P.2d 400 (1968).

late court need not resolve all hypotheses with guilt, but must only determine whether there is "substantial evidence" upon which to predicate a finding of guilt. *State v. Smith, supra; State v. Randecker, supra.*

█ We find the State offered sufficient proof of the corpus delicti as well as proof that the defendant was the criminal agent. The corpus delicti in a homicide case consists of: (1) proof of the fact of death, and (2) proof that death was caused by a criminal agency. *State v. Drew,* 70 Wn. 793, 425 P.2d 349 (1967); *State v. Little,* 57 Wn.2d 516, 358 P.2d 120 (1961). The fact of death was, of course, amply demonstrated in this case. The circumstances of the death lead to the conclusion that the death was a homicide as opposed to an accident. Shannon's body was found about 5 miles from her home, which is too far for a small child to wander unnoticed. Thus, she must have been transported there by someone else. She died from blows from a blunt instrument, making it perhaps feasible that the rock which was found on top of her head rolled down the hill and struck her accidentally. But this theory is highly improbable, given the manner in which the rock was perched on her head, the fact that her body was partly inside the culvert, and the certain inference she was taken to the culvert by a human agency. The fact that defendant was seen in his automobile near the scene of death lends further support to the conclusion that death was caused by a criminal agency, and leads us to our next conclusion, that defendant was the perpetrator of the crime.

The area in which Shannon's body was found was rural. Roads in the area are traveled mostly by logging vehicles, as they are not used for urban destinations. The fact that defendant was seen before Shannon was discovered missing, speeding into the area and returning a few minutes later, connects the defendant, circumstantially, with Shannon's death by a criminal method. The jury could properly conclude that defendant inflicted blows on the deceased, causing her death.

█ Additionally, these facts provide sufficient support

for a finding that defendant intended to kill Shannon. Specific criminal intent may be inferred from the natural and probable consequences of an act. *State v. Davis*, 73 Wn.2d 271, 438 P.2d 185 (1968); *State v. Lewis*, 69 Wn.2d 120, 417 P.2d 618 (1966). An inference of intent follows from the permissible finding that defendant inflicted blows on Shannon, either at the culvert or elsewhere, and left her dead or dying in the culvert.

Nevertheless, we find there was no evidence to support a finding of premeditation, an essential element of first-degree murder. For the jury to conclude Shannon's murder was premeditated, the State had to show an "appreciable" time existed for deliberation. *State v. Smith, supra, State v. Shirley*, 60 Wn.2d 277, 373 P.2d 777 (1962). The homicide must have been based on more than mere impulse. *Cf.* W. LaFave & A. Scott, *Criminal Law* § 73, at 565 (1972). The circumstances attendant this crime, *i.e.*, exactly how and where and why the death blows were administered, are totally unknown. Moreover, the State failed to introduce any evidence of *motive* or *planning*. Thus, there were no facts from which the jury could have properly inferred that this was a premeditated act. *State v. Smith, supra.*

Defendant's next assignment of error concerns the admission into evidence of small blood stains found on the door window and armrest of defendant's automobile. A State's expert identified the blood as type O. The victim had type O blood, as do defendant, Glenda Emerson, and 40 to 45 percent of the population.

Defendant's objection to this evidence is basically two-fold: (1) the procedures used by the State's expert were not shown to be reliable; and (2) the evidence had little, if any, probative value, and its relevancy was far exceeded by its inflammatory and prejudicial effect.

We are not persuaded by defendant's argument concerning the testing procedures employed by the State's expert. Our reading of the record shows that the State did in fact produce prima facie evidence of the reliability of the proce-

dures used by its expert. *Cf. State v. Baker*, 56 Wn.2d 846, 355 P.2d 806 (1960). *See* C. McCormick, *Law of Evidence* § 211 (2d ed. 1972). Defendant's cross-examination of this witness failed to establish the procedures used were invalid. At most, it established a remote possibility of error which could have been cured by additional testing. It therefore became the jury's duty to assess the weight which should be given the expert's testimony.

We also find this evidence had some probative value. *See State v. Shelby*, 69 Wn.2d 295, 418 P.2d 246 (1966). Although its probative value may not have been great, this is a matter which goes to the weight, rather than the admissibility of the evidence. *State v. Thomas*, 78 Ariz. 52, 275 P.2d 408 (1954); *Shanks v. State*, 185 Md. 437, 45 A.2d 85, 163 A.L.R. 931 (1945); *see* Annot., 46 A.L.R.2d 1000, § 11 (1956). Further, the evidence was not unduly inflammatory or prejudicial. *See State v. Golladay*, 78 Wn.2d 121, 470 P.2d 191 (1970). The spots of blood in question were barely visible and could not be considered gruesome. The jury was informed by the testimony of Glenda Emerson that defendant worked on the car and had sometimes cut his fingers. The jury was further aware that Glenda and Shannon Emerson and the defendant shared the same blood type. There is no reason to believe that the jury could not keep this evidence in its proper perspective.

Defendant's final assignment of error concerns alleged prosecutorial misconduct. On closing argument, the prosecutor suggested to the jury that had there been a witness to this homicide, "we may never have to have a trial," and added that he had "confidence that this jury has the guts to do what they're supposed to do." The prosecutor also told the jury the State had proved the defendant was lying, and made reference to the demeanor of the defendant as well as to Glenda Emerson's three lovers and her bias in favor of the defendant. No objection was made to the prosecutor's closing remarks.

We agree that portions of the prosecutor's closing argument exceeded the bounds of propriety. The Code of

Professional Responsibility, DR 7-106(C) (4), asserts that an attorney cannot "[a]ssert his personal opinion as to the justness of a cause, as to the credibility of a witness, . . . or as to the guilt or innocence of an accused; . . . " *See State v. Case*, 49 Wn.2d 66, 298 P.2d 500 (1956).[2] And a prosecutor, as a quasi-judicial officer, has the duty to insure that a defendant receives a fair and impartial trial and a verdict free from prejudice and based on reason. *State v. Huson*, 73 Wn.2d 660, 440 P.2d 192 (1968). A prosecutor should not, therefore, make remarks calculated to inflame the jury and divert it from its central task.

We find particularly objectionable the prosecutor's remark suggesting the possibility of no trial if the murder had been witnessed, and the one urging the jury to "have the guts" to return a guilty verdict. Remarks such as those have no place in the trial of a criminal case.

We are mindful that exceptions must be taken to improper prosecutorial remarks to preserve error unless the misconduct was so prejudicial that no instruction would cure it. *State v. Basford*, 76 Wn.2d 522, 457 P.2d 1010 (1969). And, assuming error is preserved, prosecutorial misconduct constitutes grounds for reversal only when there is a substantial likelihood it affected the verdict and had the effect of depriving a defendant of a fair and impartial trial. *State v. Music*, 79 Wn.2d 699, 489 P.2d 159 (1971). Because of our rulings on precedings issues, however, we need not decide whether the error may be considered, and if so, whether it constitutes independent grounds for reversal. Nor, for the same reason, need we decide the issue raised by defendant concerning juror misconduct. We assume that these problems will not occur again.

---

[2]This case held that statements made by a deputy prosecutor which referred to his personal belief in the defendant's guilt are highly prejudicial. The court hastened to caution, however, that a breach of one of the canons of ethics by a prosecutor is not necessarily grounds for reversal, and might not even constitute an error of law. A number of decisions have held that a prosecutor may comment on the defendant's credibility. *E.g.*, *State v. Jefferson*, 11 Wn. App. 566, 524 P.2d 248 (1974); *State v. Walton*, 5 Wn. App. 150, 486 P.2d 1118 (1971); *State v. Adams*, 76 Wn.2d 650, 458 P.2d 558 (1969).

In summary, we hold that defendant's conviction must be reversed because pretrial statements taken from him were improperly admitted, and that there was insufficient evidence of a premeditated design. Accordingly, the judgment and orders from which this appeal is taken are reversed, and the cause remanded for a new trial, excluding a first-degree murder charge.

PETRIE, C.J., and REED, J., concur.

Petition for rehearing denied February 19, 1976.

Review granted by Supreme Court April 23, 1976.