[No. 3551–2.   Division Two.   July 23, 1979.]

THE STATE OF WASHINGTON, *Respondent,* v. DONNALL
SAVAGE PENNEWELL, *Appellant.*

*Franklin D. Burgess,* for appellant.

*Don Herron, Prosecuting Attorney,* and *Joseph D. Mladinov, Senior Deputy,* for respondent.

SOULE, J.—Defendant was charged with second–degree murder of his 27–month–old son. The jury was instructed on the lesser included offenses of first–degree manslaughter and second–degree manslaughter. He was convicted of first–degree manslaughter from which conviction he appeals. We affirm.

Three assignments of error are presented for our consideration.

1. There was insufficient evidence to sustain a conviction in that the State was unable to establish the corpus delicti beyond a reasonable doubt.

2. The failure of the State to produce clothing worn by the victim deprived defendant of a fair trial.

3. Photographs taken at the autopsy were introduced solely to arouse the passion of the jury and impaired defendant's constitutional right to a fair trial.

## EVIDENCE OF CORPUS DELICTI

At the end of the prosecution's case in chief, defendant moved for a dismissal based on failure of proof of the corpus delicti. The motion was denied and defendant elected to introduce substantive evidence on his own behalf. By so doing, defendant waived his challenge to the sufficiency of the evidence as it stood at that point. *State v. Smith,* 74 Wn.2d 744, 768, 446 P.2d 571 (1968); *State v. Mudge,* 69 Wn.2d 861, 420 P.2d 863 (1966); *State v. Portrey,* 6 Wn. App. 380, 492 P.2d 1050 (1972).

■■ The partial verbatim report of proceedings furnished by the defendant does not disclose that the motion to dismiss on this ground was renewed at the end of the case, nor did defendant move to arrest the judgment.

Therefore, we could properly decline to consider the matter, but to dispel the impression that we are avoiding a fundamental problem by resorting to a technicality, we will discuss the evidence. Because we are actually examining the sufficiency of the evidence, it will be viewed in the light most favorable to the prosecution. *State v. McDonald,* 74 Wn.2d 141, 443 P.2d 651 (1968). The true issue is whether there is substantial evidence of a criminal agency. *State v. Drew,* 70 Wn.2d 793, 425 P.2d 349 (1967); *State v. Smith,* 12 Wn. App. 720, 531 P.2d 843 (1975).

On March 15, 1978, defendant had his son with him during the entire day and that custody was not shared with anyone else. At 8:30 p.m., he brought the boy to the emergency room of Mary Bridge Hospital. Upon admission he was cold, unconscious and unresponsive. After unsuccessful measures to revive the child, the emergency room physician concluded that he had been dead for only a short time before arriving since rigor mortis had not set in. Upon examination, he was found to have multiple bruises on the face, forehead, chest, abdomen and scrotum. All appeared to have been incurred within 24 hours. There were no bruises on the back.

In supplying the doctor with the medical history, defendant related that the boy had fallen in the bathtub that day; that he had had other falls in the living room and still further falls at about 3 to 3:30 p.m. while riding in the father's pickup truck. One of those falls in the truck involved falling sidewise against the passenger door, and two others occurred when he fell from the cab seat to the truck floor. In at least one of the falls to the floor, he struck a tool box. On initial examination, the most serious injuries appeared to be to the head.

That same history was repeated by the father to the deputy coroner that evening. It included a statement that upon arrival at the destination in the Tillicum area, defendant put the child on the seat of the truck to sleep, where he stayed throughout the rest of the day and evening until defendant noticed that he was unable to arouse him,

whereupon he immediately brought him to the hospital. The deputy coroner recollected that the father said he arrived home about 8 p.m.

Two neighbors testified that they had seen defendant parking his trailer at his home around 7 or 7:30 p.m. on the evening of March 15. However, from the time sequence on the entire journey, the jury could have found that the father initially returned home at least by 6 p.m.

An autopsy was ordered. The bruises noted by the emergency room physician were also noted by Dr. Wicks, the pathologist. In addition, he observed that there was a recent bruise directly on the top of the head which was concealed from casual observation by the hair and that the abdomen was markedly distended. The bruises were not black and blue indicating that they were but a few hours old. The contents of the stomach were in the advancing stage of digestion.[1]

Exploration of the abdominal cavity revealed that the small intestine had been sheared from its attachments to the mesentery tissue by an angular blow causing rapid and massive bleeding into the abdominal cavity.

Dr. Wicks testified that the injury was of such severity that although the child would initially be in pain, he would become unconscious within a minute or two and die within an hour or less.

Dr. Wicks expressed the opinion that the injury was a result of severe trauma. He ruled out the fall in the bathtub, the falls about the house and the falls in the truck as sufficient to produce this type of injury. He offered the further opinion that the amount of force required to effect this injury could come from a blow by a man's fist or foot, but only if the child were backed up against a solid object so he could not recoil from the blow. He also agreed that sufficient force could be exerted by the dropping of a tire and wheel from the bed of a pickup truck, but only if the boy were *already lying on the ground* when struck so that he,

---

[1]Apparently defendant had last fed the child about 1 p.m.

in effect, would be crushed. He further testified that the child was healthy apart from the observed injuries and that the head and scrotum injury could not have caused the death. His opinion was that the child had been subjected to a crushing force but could not tell what instrumentality caused it. Because of the extensive nature of the injuries and the lack of bruising on the back, Dr. Wicks said that the tire was not a likely agency.

On March 17, defendant gave exculpatory statements to Detective Carli of the Tacoma Police Department. The first statement essentially repeated the history given to the examining physician and the deputy coroner. The second was given only after defendant learned of the cause of death. In it, defendant recounted that about 3 p.m., in preparation for the trip to Tillicum, he was removing the tire from the bed of the truck when it rolled or flipped off the truck and struck the boy who was *standing* behind the truck, knocked him down and then fell across him. This version was essentially repeated by defendant when he took the stand. In open court defendant testified the boy did not appear to be hurt, did not gasp for breath, did not cry, and did not in any way act as if he were in pain. Defendant then said that the boy either walked or was carried to the cab of the truck. Defendant started for Tillicum in about 10 minutes and during this trip his son had three other minor falls. Further, although he appeared to be sleepy, he was responsive during the time it took to go from South 43rd and Warner to Tillicum[2] and that during the trip there was a stop for gas. Upon arrival in Tillicum he was still responsive. Defendant then had the boy lie down on the seat to sleep and he noticed nothing wrong with him at that time or thereafter until just before he brought him to the hospital. Defendant further said that when he first realized that the boy was in trouble his forehead was cold but his body was warm. Defendant stayed in Tillicum about 1 hour.

---

[2]This journey would reasonably take 15 to 30 minutes exclusive of the time required to secure gas.

Without trying further to correlate the time patterns, we note that neither statement can be reconciled with the autopsy findings. The second statement is significant because even assuming that the tire did in fact fall from the truck and strike the boy *as described,* it could not have inflicted the injury which caused the death. The boy's continued consciousness during the trip to Tillicum would have been impossible had the tire been the instrumentality which sheared the intestine from its attachments.

■ Mere opportunity to commit a criminal act, standing alone, provides no proof that defendant committed the criminal act, but if that opportunity is coupled with other circumstances, the proof may be sufficient to support a finding based upon circumstantial evidence that the accused did commit the act. *State v. Randecker,* 79 Wn.2d 512, 487 P.2d 1295 (1971).

When a defendant has sole custody of a victim and there is evidence of other inculpatory circumstances tending to show guilt, the evidence may be sufficient to convict. In *State v. Green,* 2 Wn. App. 57, 466 P.2d 193 (1970), it was held that a false or improbable explanation is sufficient evidence of other inculpatory circumstances to sustain a verdict of guilty. In that case, the facts concerning the injury and the custody of the victim when the injury occurred were remarkably similar to the situation in the case before us.

Because defendant had total control of the victim at all critical times and gave two explanations of accidental injury, neither of which was inculpatory per se, but neither of which was possible in view of the medical findings, we hold that the circumstantial evidence was sufficient to enable the jury to find that the child was the victim of a criminal act by the defendant. *State v. Smith,* 12 Wn. App. 720, 531 P.2d 843 (1975), *aff'd on other grounds,* 88 Wn.2d 127, 559 P.2d 970 (1977). Whether the circumstances were clearly inconsistent with any *reasonable* hypothesis of innocence, was a question for the trier of the fact. *State v. Johnsen,* 76 Wn.2d 755, 458 P.2d 887 (1969).

Child abuse cases from other jurisdictions recognize that circumstantial evidence may be sufficient to support a finding of criminal agency. *People v. Kinzell,* 106 Ill. App. 2d 349, 245 N.E.2d 319 (1969); *Biddy v. State,* 277 So. 2d 115 (Miss. 1973); *State v. Coulter,* 84 N.M. 647, 506 P.2d 804 (1973); *State v. Lynn,* 73 Wn.2d 117, 436 P.2d 463 (1968) and *State v. Guiles,* 53 Wn.2d 386, 333 P.2d 923 (1959) are distinguishable because in each case the defendant did not have exclusive control of the victim during the critical period.

### FAILURE TO PRODUCE CLOTHING

Defendant asserts that the failure of the prosecution to produce the clothing worn by the victim deprived defendant of a fair trial. *State v. Wright,* 87 Wn.2d 783, 557 P.2d 1 (1976). He argues that examination of the clothing might have revealed tire particles "thereby substantiating appellant's possible explanation for the rupture," and

> the presence or absence of dirt, mud or other substances on the clothing could have assisted in determining whether or not a kick had been administered to the deceased or whether or not the deceased had fallen at the times and places alleged by the appellant.[3]

The issue is more properly phrased in terms of failure to preserve evidence rather than failure to produce it. From the testimony of the deputy coroner, it is clear that the clothes were in the emergency room and were observed by him. By virtue of his routine instructions, they should have gone with the body to the morgue. For some unexplained reason they were not sent by the hospital staff. No request was made by the defense for production of the clothing until 1 week before the trial, by which time they could not be found. However, the duty to preserve arises before a request for discovery is made. *State v. Wright, supra; State v. Haynes,* 16 Wn. App. 778, 559 P.2d 583 (1977). Nevertheless, the State need only preserve objects coming into its possession "if it is reasonably apparent the object . . .

---

[3]Brief for Appellant at 6.

constitute[s] material evidence." *State v. Hall,* 22 Wn. App. 862, 867, 593 P.2d 554 (1979).

Inadvertent loss, as contrasted with purposeful destruction of evidence, may not be used as a justification for nonproduction of that evidence. *State v. Wright, supra; Seattle v. Fettig,* 10 Wn. App. 773, 519 P.2d 1002 (1974). However, it may have a bearing on the remedy to be fashioned by the court. *State v. Wright, supra* at 792.

■ The pertinent inquiry is whether or not there was a reasonable possibility that the evidence was material to guilt or innocence and favorable to the defendant. *State v. Wright, supra* at 789. *See also State v. Weygandt,* 20 Wn. App. 599, 581 P.2d 1376 (1978).

In *State v. Canaday,* 90 Wn.2d 808, 585 P.2d 1185 (1978), it was observed that the destruction of evidence in the *Wright* case was the totality of the direct evidence. All else was circumstantial. In *Wright,* the court listed nine areas where the evidence destroyed could possibly have assisted the defense. They included not only the identity of the victim, the body never having been conclusively identified as that of the defendant's wife, but the plausible contention that the deed was done by one of at least two other persons, both of whom had access to the defendant at the time of her disappearance. Included in the items destroyed was the coat of another man which was in fact found in the room. Further, the court noted that the amount of dirt, oil, mud or other substances on the shoes or clothing of the victim, or on the sheet or blanket in which the body was wrapped, could have assisted in determining whether the victim was killed at the location where found or at some other location. In addition, the ownership of the sheet or blanket, if it could have been determined might have been a clue to the identity of the perpetrator of the crime.

In the case before us, the primary direct evidence, the body, was carefully preserved and its condition was simply inconsistent with the testimony of the defendant. *Cf. State v. Jelle,* 21 Wn. App. 872, 587 P.2d 595 (1978).

In *State v. Hall, supra,* we held that the loss of 22 photographs did not warrant the imposition of sanctions where there was "no reasonable possibility" that the photographs would have furnished material evidence favorable to the defendant.

In *State v. Bernhardt,* 20 Wn. App. 244, 579 P.2d 1344 (1978), it was observed that while the reasonable possibility standard is quite broad, it is not infinite and that imaginative speculation is not enough. This holding is consistent with the statement in *United States v. Agurs,* 427 U.S. 97, 109–10, 49 L. Ed. 2d 342, 353, 96 S. Ct. 2392 (1976):

> The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.

Of particular significance as applied to the evidence in this case is the further observation in *United States v. Agurs, supra* at 112:

> Unless every nondisclosure is regarded as automatic error, the constitutional standard of materiality must impose a higher burden on the defendant.
>
> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

(Footnotes omitted.)

Judged by this standard, and the entire record, we see no reason to grant relief.

In the case before us, even if the clothing had tire particles thereon, it would prove only that the victim had contact with the tire. It would be no proof at all that the tire was the fatal agency because, by the defendant's own testimony, the child was conscious for a substantial period of time, at least 30 minutes, and exhibiting no signs of distress, yet by the undisputed medical evidence he became unconscious within 2 minutes after receiving the fatal blow. Thus, the fatal instrument could not have been the tire.

Likewise, the presence of other dirt on the clothing would have proven nothing. The defendant himself testified that a moment or two before the tire accident, he had "smacked" or slapped the boy on the back of the head causing him to fall forward to the ground, skinning his nose and face on some rocks. All of the falls "at the time and places alleged by the appellant"[4] were medically excluded as the cause of death and the suggestion that the clothing might have revealed something concerning a kick is pure speculation. Further, even if it had, this would not be favorable to the defendant.[5]

We hold that under the record of this case, there is no reasonable possibility that the clothing was material and favorable to the accused, and that its loss did not deprive the defendant of a fair trial. *Cf. State v. Gilcrist,* 91 Wn.2d 603, 590 P.2d 809 (1979). Further, we hold that in light of defendant's statement to the emergency room physician and the deputy coroner it was not reasonably apparent that

---

[4]Brief for Appellant at 7.

[5]In *People v. Harris,* 62 Cal. App. 3d 859, 133 Cal. Rptr. 352 (1976), it was held to be error to dismiss a case when it was discovered that the police had destroyed a cap allegedly worn by the burglar when the destruction was inadvertent and without malice and the prosecution had not relied on the cap to point to the defendant's guilt. It was observed that if the cap were a perfect fit it would aid the prosecution, but remembering that it fell off the defendant's head during flight, a misfit would not necessarily help the defendant. The only possibility by which it would aid the defendant would be that if it were so large or so small in comparison to defendant's head to appear outlandish. The court held that this possibility was not of sufficient significance to justify the extreme measure of dismissal or support a determination that a fair trial was impossible.

the clothing might constitute material evidence and thus the duty to preserve did not arise. *State v. Hall, supra.* Defendant by his less than complete statement misled the investigating authorities concerning the now claimed importance of the evidence. He will not be permitted to take advantage of his own action in this regard.

### ADMISSION OF AUTOPSY SLIDES

Dr. Wicks used seven colored slides to illustrate his testimony. Three of them were of the body before the autopsy proceedings were undertaken. The others portrayed conditions found during the pathological examination. They are unpleasant, indeed gruesome. Defendant contends that the slides were introduced solely to arouse the passions of the jury and thus impair defendant's right to a fair trial. We do not agree.

In the absence of the jury Dr. Wicks displayed the slides and explained them to the trial judge. Objection was made timely on the ground that they were inflammatory and, in counsel's words, not "absolutely necessary to describe what happened here; . . .", and also on the ground that some were duplicates of others.

After hearing from the doctor and receiving substantial arguments, the trial judge said

> Well, the Court is going to have to concede that the photographs are unpleasant, but I don't feel that they are of such a nature as to inflame the Jury in this case. *I feel that it is necessary for the doctor to make a full explanation of what occurred to the Jury*; and I feel that under those circumstances, they should be admissible. What I am really trying to say is I don't really feel that they are going to inflame the Jury in this case, admitting all the while that they are unpleasant. I just don't feel that the results that counsel is afraid of is going to occur.

(Italics ours.)

■ With respect to defendant's contention that the sole purpose of the pictures was to inflame the jury, if such were the sole or even primary purpose they would be inadmissible. The test is whether the probative value outweighs their

probable prejudicial effect. *State v. Adams,* 76 Wn.2d 650, 655, 458 P.2d 558 (1969). However, *Adams* also states at page 654:

> Pictures that accurately represent the true state or condition of the thing depicted are admissible if they have probative value upon some element of the crime charged. *State v. Hawkins,* 70 Wn.2d 697, 425 P.2d 390 (1967). They have been held to have probative value where they were used to illustrate or explain the testimony of experts such as doctors. *State v. Little,* 57 Wn.2d 516, 358 P.2d 120 (1961); *State v. Nyland,* 47 Wn.2d 240, 287 P.2d 345 (1955); *State v. Smith,* 196 Wash. 534, 83 P.2d 749 (1938).

In the last analysis, the decision rests with the trial judge subject to review by the appellate court for abuse of discretion. *State v. Vidal,* 82 Wn.2d 74, 508 P.2d 158 (1973); *State v. Adams, supra.*

In *State v. Tikka,* 8 Wn. App. 736, 739, 509 P.2d 101 (1973), the rule was stated as follows:

> An abuse of the trial court's discretion regarding the admissibility of photographs will occur only if the photographs do not have probative value and will so inflame and prejudice the jury that their objective consideration of guilt or innocence is overwhelmed.

Three of the photographs in question clearly have relevance in that they portray the condition of the child as viewed upon admission to the hospital. The others demonstrate the conditions found in the course of the autopsy and from which the cause of death was ascertained. The trial judge previewed them carefully and concluded that they were in fact necessary for the doctor to make his full explanation. The trial judge also gave due consideration to their possible inflammatory nature before concluding that they should be admitted.[6] We hold that there was no abuse of

---

[6]The statement made on page 12 of appellant's brief, ". . . the autopsy surgeon admitted . . . that the case could be understood by the jury without them" is not supported by our examination of the record. The nearest approach to the subject which we can find is on page 114 of the verbatim report of proceedings in which Mr. Burgess in arguing to the court said, "I have talked to Dr. Wicks; and I

discretion. The slides did have probative value and we cannot say that the gruesome nature so outweighed that probative value that they should not have been admitted.

Neither do we find error in the admission of two slides which allegedly are duplicitous. They are enlargements of the areas portrayed by two others but were used by Dr. Wicks to explain more clearly the conditions which he found.[7]

The judgment of conviction is affirmed.

REED, A.C.J., and PETRIE, J., concur.

Reconsideration denied August 16, 1979.

Review denied by Supreme Court November 9, 1979.

know from talking to Dr. Wicks he can adequately explain this without showing some of what we have seen here on, that is, on the intestines and the insides of this kid." This is a statement of counsel's opinion, but he did not put the question to Dr. Wicks in the course of his cross–examination or in the course of the preview and a reading of record in connection with the use actually made of the slides leads us to believe that the slides were of substantial assistance in explaining to the jury the nature of the injury and its severity.

[7]The record would have been easier to understand if the exhibits had been marked for identification before the preview. We have no way of being certain as to precisely which slides defendant was objecting. Further, during his testimony, Dr. Wicks was not asked by either attorney to identify any slide by its exhibit number.