277 So.2d 115 (1973)
Mrs. Carolee BIDDY
v.
STATE of Mississippi.
Nos. 47095, 47100.
Supreme Court of Mississippi.
January 8, 1973.
Rehearing Denied February 26, 1973.
*116 John R. Poole, Charles S. Wright, Harry Kelley, Jackson, for appellant.
A.F. Summer, Atty. Gen. by Karen Gilfoy, Sp. Asst. Atty. Gen., Jackson, for appellee.
ROBERTSON, Justice:
Mrs. Carolee Biddy was indicted by the Hinds County Circuit Court Grand Jury for the murder of her 6-year-old stepdaughter, Mona Biddy. A change of venue was granted to the Circuit Court of Jackson County, where appellant was tried for murder, but convicted of manslaughter by a Jackson County Petit Jury. She was sentenced to serve a term of 20 years in the State Penitentiary.
About 7:55 A.M. on December 3, 1970, appellant called the Jackson Police Department to report the disappearance of Mona Biddy, her mentally retarded stepdaughter. A massive search was conducted by the Jackson Police Department, law enforcement officers of Hinds and Rankin Counties, three or four hundred National Guardsmen, and many civilians and students.
On December 8th, five days after her reported disappearance, Mona's body was found by two fishermen in a cove on the Rankin County side of the Barnett Reservoir. Her body was at the water's edge and water from time to time would lap over it.
The first assignment of error was that the corpus delicti was not proven to the exclusion of every reasonable theory consistent with innocence.
*117 The corpus delicti in a homicide case consists of two fundamental facts: (1) The fact of the death of the deceased, and (2) The fact of the existence of a criminal agency as the cause of death. Pitts v. State, 43 Miss. 472 (1870). Both facts of the corpus delicti may be proved by circumstantial evidence. Perkins v. State, 160 Miss. 720, 135 So. 357 (1931).
On the afternoon of December 8, 1970, immediately after the body had been found, Dr. Forrest Bratley, a skilled and experienced pathologist, performed a complete autopsy on Mona's body at the University Medical Center in Jackson. His detailed written findings (a part of the record) ended with Dr. Bratley's positive opinion that the most probable cause of death was suffocation. The report also stated:
"The complete postmortem examination does not reveal any natural cause of death nor is there any evidence of any traumatic injuries which could have caused death. The toxicological examination does not reveal the presence of any poison in the blood or stomach contents."
On June 24, 1971, Mona Biddy's body was exhumed, and a second autopsy performed by Dr. Forrest Bratley in conjunction with Dr. Donald Dore, Jr., the pathologist at the Singing River Hospital in Pascagoula, Mississippi. This autopsy was performed at Barrytown, Alabama, where the child had been buried.
This second autopsy was performed for the express purpose of determining whether Mona had swallowed any Liquid Plumr prior to her death. No signs or indications of any kind were found that the child had swallowed any caustic or corrosive substance. After a very detailed and thorough examination on the witness stand, Dr. Bratley stated that in his opinion death was caused by suffocation and that this suffocation was by external application of force by someone stronger than the child. Dr. Bratley never waived in his opinion as to the cause of death, even though he was extensively cross-examined as to other possible causes of death and the fact that findings of death by suffocation are similar to findings of death from heart disease, shock, laryngeal spasm, bronchial spasm, respiratory arrest and cardiac arrest. From his knowledge gained from personally performing the first and second autopsies, he clearly and decisively negatived any other cause of death. On the second autopsy, he and Dr. Donald Dore found no evidence whatsoever of Liquid Plumr or other caustic or corrosive substance in Mona's digestive tract or vital organs. If Mona had had laryngeal spasm it would have had to have been caused by drinking Liquid Plumr or other caustic substance.
Dr. Howard Nichols, a skilled and experienced pediatrician of Jackson, who had been Mona's doctor for the first 1 1/2 years of her life, after a detailed study of both autopsy reports testified that it was his considered opinion that the probable cause of death was suffocation due to external pressure over her nose and mouth. He further testified that it was his opinion that Liquid Plumr was not involved in Mona's death.
Dr. Arthur Hume, Associate Professor of Pharmacology and Toxicology at the University Medical Center and Toxicologist for the Mississippi Crime Laboratory, examined and tested blood samples, tissues of vital organs, gastric contents and other samples from Mona's body on December 9th, 1970, the day after her body was found, for poisons and drugs. Dr. Hume testified that he would consider Liquid Plumr a poison. He found no poison of any kind in her system. He did find a slight trace of dramamine, a stomach settler.
Dr. Milton Helpern, the chief medical examiner of the city of New York, after examining the autopsy reports, testified that he could not state with certainty the cause of death. He testified as to possible causes only.
*118 Dr. Lucien L. Leape, a pediatric surgeon with the University of Kansas Medical School, who had made a special study of problems linked with lye ingestion by children, testified that he could not say what was the cause of death. He did testify that he had never heard of any child dying as a result of swallowing Liquid Plumr.
The testimony of all of these witnesses, and the exhibits introduced, were for the consideration of the trial jury. We feel that there was ample evidence in the record to prove the corpus delicti beyond a reasonable doubt and to the exclusion of every reasonable theory consistent with innocence.
The next assignment of error was that the two oral statements made by appellant were inadmissible under the fifth, sixth, and fourteenth amendments to the Constitution of the United States.
It must be remembered, in discussing this assignment of error, that the appellant and her husband, Ted L. Biddy, asked the Jackson Police Department for its help in locating their mentally retarded daughter. Every lead that the police would get was discussed and examined with the Biddys. The police were in constant touch with the Biddys and the Biddys with them. Both were apparently interested in what had happened to Mona Biddy.
It must also be kept in mind that, at the specific instance of the Biddys, the Jackson Police Department and its trained and skilled investigators and indeed the law enforcement officers of both Hinds and Rankin Counties and of the State of Mississippi, had expended a tremendous amount of time and effort and thought into solving the problem of what had happened to Mona.
On December 15, 1970, the police had found another item of clothing apparently worn by Mona at the time of her disappearance, so they contacted Mrs. Biddy, and she called her husband. The end result was that Mr. and Mrs. Biddy came down to police headquarters.
Lieutenant Wesley L. Reeves, Jackson Police Department, who had been on the case from the beginning, in the presence of Lieutenant Price of the Jackson Police Department, and Thomas Zebert, County Attorney of Rankin County, asked Mrs. Biddy to go over once again the details of Mona's disappearance. Reeves testified that after she had done this:
"Then we told her we'd like to talk to her about it, and before we did, we would like to advise her of her rights.
"Q All right. Now, who was in this conference room at this time?
"A Lieutenant Price, myself, and Mr. Zebert, Tom Zebert.
"Q And you four were the only ones in there?
"A Yes sir.
"Q All right. Then, what did you do then?
"A I told her that she did not have to talk to us; that she was entitled to an attorney, and what she did say could be used against her in court.
"In fact, I then told her that we had a list of her rights on a statement blank, and I would like for Lieutenant Price to read them to her, so she would understand it.
"Lieutenant Price did read this statement of her rights, one at a time, and then I asked her if she understood each, and she said she did. Mr. Zebert asked her if she understood them, and she said she did.
"We asked her what education she had, and she said she was a high school graduate. We were convinced that she understood her rights.
"Q Did she tell you where she had been employed previously?

*119 "A Yes sir. She had been employed as a secretary for Michael Baker, an engineering firm.
"Q What kind of spirit was she in at this time?
"A She was very cooperative. She seemed to be in good spirits."
At this time she signed a written waiver, which set forth her rights in detail. Reeves, Price and Zebert then signed as witnesses to her signature. She denied any involvement in Mona's disappearance.
Later on December 15th Mrs. Biddy and her husband went in their car to Highway Patrol Headquarters. Her rights were again explained to her and she signed a second detailed waiver.
On the night of December 16th, Lieutenant Reeves, while off-duty and at his home, received a telephone call from the Biddys reporting that appellant had been attacked and stabbed. The Biddys wanted him to come to their home, so he called Lieutenant Price and they went to the Biddy home. Mrs. Biddy told them about the attack and how she had gotten away from her assailant. She had a superficial cut on her hip.
Late at night on December 26, 1970, Lt. Reeves received another telephone call from the Biddy home. It was reported to him that 2 1/2-year-old Candice Biddy had been kidnapped. It was a very cold night and Lt. Reeves went immediately to the Biddy home. Mrs. Biddy stated that someone came in the window, came by Mr. Biddy who was asleep in the den, got Candice, and went back out the window, tying up the family dog and putting him into the closet. Mr. Biddy found Candice, scantily clad, near a ditch in the Biddy backyard. Lt. Reeves checked the window that Mrs. Biddy had pointed out and found dust on the windowsill that had not been disturbed.
Lt. Reeves was advised by Mr. and Mrs. Biddy that they were going to Georgia on the next day, December 27th, to visit Mr. Biddy's parents. Early on the morning of December 27th Lts. Reeves and Price went back to the Biddy home, looked around the backyard and the ditch but could find no evidence that someone had kidnapped Candice.
Being advised that the Biddys were ready to leave town and that Mr. Biddy would like to talk to them, the Biddys followed Reeves and Price back to police headquarters in their own car.
Out of the presence of Mrs. Biddy, Reeves and Price told Mr. Biddy that they had found that Mrs. Biddy had not modeled clothes for a local clothing store and received clothes for her services, as both Mrs. Biddy and Mr. Biddy had told them. They also told Mr. Biddy that Mrs. Biddy had not gone to a health studio once a week, as she had told them. Reeves and Price also told Mr. Biddy that their investigation of the assault and stabbing of Mrs. Biddy had convinced them that it did not happen. Mr. Biddy agreed with them. They also informed Mr. Biddy that Candice Biddy had not been kidnapped as Mrs. Biddy reported. Biddy agreed with them on this and asked to talk to his wife.
Before they had a chance to talk very much, Reeves was advised that Mr. Charles Wright, a local attorney who had been called by Mr. Biddy's partner, Mal Sims, was downstairs and wanted to see Biddy. While Wright and Biddy were talking, Reeves and Price told Mrs. Biddy that they would like to ask her some questions, and before asking her any questions Lieutenant Reeves said:
"[D]o you understand your rights? You have been advised of your rights before.' and she said, yes, she understood them.
"At that time, Mr. Biddy and Mr. Wright came back. Mr. Biddy came into the room, Mr. Wright stood at the door. He had told me previously that he was ill, and would have to go home. So, he left.

*120 "Q Was Mrs. Biddy aware of the fact that Mr. Wright was there?
"A He came to the door, and the door was open. She was sitting right by the door. They did not talk, but he talked to Mr. Biddy.
"Q And did Mr. Biddy come in and talk to Mrs. Biddy?
"A Yes sir.
"Q All right. Tell me what happened.
"A At that time, Mr. Biddy began to talk to Mrs. Biddy, and asking her about these different instances, about the clothing store, about the health studio, about the stabbing and the kidnapping.
"She admitted that she had not worked for the clothing store, and she partially admitted not having gone to the health studio as regularly as she had claimed to be going.
"She admitted that she had faked the stabbing, and had faked the kidnapping.
"At this time, Mr. Biddy became very emotionally upset, and 
"Q What about the appearance of the defendant, Mrs. Carolee Biddy? How was she at this time?
"A She was a little emotional, not very much, at that time. She seemed like she wanted to tell him something.
"At that time I told her `Mrs. Biddy, now is a good time to tell Mr. Biddy if you were involved in the disappearance of Mona'. I told her that Mona was gone, she wouldn't  couldn't come back, and that she was afflicted, that the doctors had told us she would never get any better, and that now would be a good time to talk to her husband.
"They were sitting facing each other, holding hands. She looked straight at Mr. Biddy, and said, `Ted, I am sorry I did it.' She said `Ted, I didn't mean to do it.' And she broke down. She stopped what she was going to say."
Mrs. Biddy then continued her story of what happened the night of December 2nd. Mona had gotten hold of some Liquid Plumr at about 7:30 P.M., had drunk some of it, that it made her violently ill and she vomited. Mrs. Biddy tried to feed her but Mona could not eat. Mrs. Biddy called Dr. Howard Nichols, her pediatrician, and Dr. Nichols advised her to examine Mona's mouth and if her mouth was burned on the inside to call him back. If Mona's mouth was not burned, she was all right and just give her something to settle her stomach. Mrs. Biddy put Mona to bed around 8:30 P.M. Mrs. Biddy went by Mona's bed about 10:30 P.M. and found her "scooted down the bed" with the bed clothing wrapped around her head. Lt. Reeves continued:
"She said she unwrapped the bed clothing and couldn't get any response from Mona. She said this frightened her, and she picked Mona up and took her out to the den, and laid her down on the couch. She said she just flopped down.
"She said she started to call Ted, but she was afraid that people would think that she had something to do with it; that she had realized she was dead, and she was afraid to call Ted, she said.
"She started to call a doctor, and she just decided to get rid of the body, and take the body so they wouldn't blame her with it. She carried her out and put her in her car and drove to the reservoir.
"She drove to a particular spot near the Lakeview Marina, because she and Ted had spent a lot of time out there in the past. She said she put the body down near the bank, kissed it on the forehead, and left it there so it would be found, and then she came back home."
We think that this testimony was properly admitted. It is perfectly clear to *121 us that Mrs. Biddy thoroughly understood her rights and that she had intelligently waived them, not once but twice in writing, and also several times orally. Even on December 27th, immediately before her statements she acknowledged that she understood her rights. There are no magic words that law officers must meticulously repeat each time they question a person. This conclusion was also reached in Maguire v. United States, 396 F.2d 327 (9th Cir.1968); Sossamon v. State, 245 Ark. 306, 432 S.W.2d 469 (1968); People v. Hill, 66 Cal.2d 536, 58 Cal. Rptr. 340, 426 P.2d 908 (1967); State v. Graves, 259 La. 526, 250 So.2d 727 (1971); State v. Rowe, 77 Wash.2d 955, 468 P.2d 1000 (1970).
Appellant next contends that the court erred in granting an instruction advising the jury that should they convict appellant of manslaughter, the court might sentence appellant to the penitentiary for a term not to exceed twenty years.
This is the instruction complained of:
"The Court instructs the Jury for the State of Mississippi that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant, Carolee Biddy, is guilty of manslaughter, you should certify to the Court the following verdict, to-wit:
We the Jury, find the Defendant guilty of manslaughter.
Whereupon the Court might sentence the Defendant to serve a term of years in the penitentiary, not to exceed 20 years."
This same contention was made long ago in Stevenson v. State, 136 Miss. 22, 100 So. 525 (1924). The Court in Stevenson answered this argument in this way:
"In the case now before us the instruction informed the jury that in case of a conviction of manslaughter the court might sentence the defendant to serve a term of years in the penitentiary, not to exceed 20 years. We do not think that this instruction can properly be said to be an invitation or inducement to the jury to compromise on the lesser offense, and, if this instruction was error at all, it was not prejudicial to the rights of the appellant and will not justify a reversal under the facts of this record." 136 Miss. at 29-30, 100 So. at 526.
In Blalock v. State, 148 Miss. 1, 113 So. 627 (1927), in ruling on a similar manslaughter instruction, the Court had this to say:
"In the case before us, the instruction on the punishment for manslaughter does not call the jury's attention to the minimum punishment, and does not, by inference, lead the jury to believe that, if so convicted, a light punishment will be inflicted. We think this distinction important between the Ellerbe Case and this one. It is one thing to hold out the definition of a minimum punishment, and another to tell the jury of a maximum punishment. It was, in our opinion, the singling out, in the Ellerbe Case [Ellerbe v. State, 79 Miss. 10, 30 So. 57], the minimum features of punishment for manslaughter, that produced the reversal therein. It is difficult to see how it prejudices the right of a person being tried for a crime for the jury to know what the punishment is that may follow a conviction for that crime. It is true that the court administers the punishment, except in capital cases, and some others not here involved, and that the jury should not be told anything in reference to what that punishment will be; but we fail to see how the present instruction prejudiced the defendant's rights. It certainly did not lead the jury to believe he would be dealt with leniently. The maximum was stated, and the minimum was left out.
"In so far as the effect on the jury is concerned, we cannot see it had any harmful effect upon his rights. Anything less than twenty years for manslaughter is in the discretion of the *122 court, and it does in no wise prejudice the defendant's rights for the jury to know what the maximum would be. At least, we think it is apparent that his rights were not so prejudiced as to cause the court to reverse a judgment therefor. Stevenson v. State, 136 Miss. 22, 100 So. 525. We hold, therefore, that there is no reversible error in this objection to the instruction." 148 Miss. at 5, 113 So. at 628.
The final assignment of error was that the trial court erred in overruling the motion to vacate the judgment because the jury verdict was returned on Sunday and the trial judge sentenced the appellant on Sunday.
The five-day trial was concluded on Friday, September 3, 1971, and the jury on that day, with the exhibits and written instructions of the Court, retried to the jury room to consider what verdict they should return. They were unable to reach a verdict and they resumed their deliberations on Saturday, September 4th. Still being unable to reach a verdict, they resumed their deliberations about 9:30 A.M., Sunday, September 5th, and about 2:30 P.M. they returned their verdict in open court. Monday, September 6, 1971, would be Labor Day. So, the Court inquired of counsel for the Defendant whether they desired that sentence be deferred until a later date. Counsel for the Defendant responded that they did not so desire. Whereupon, the Court sentenced the Defendant to twenty (20) years in the State Penitentiary.
In Burrage v. State, 101 Miss. 598, 58 So. 217 (1912), a murder prosecution was concluded on Saturday night, and the jury returned its verdict into court at 12:06 A.M. Sunday morning. In that case, it was contended that the verdict and judgment were null and void because rendered on Sunday. This Court affirmed the conviction and sentence, stating:
"It is true that we have no statute providing that verdicts may be received on Sunday, and it may be that a judgment rendered on Sunday is void, but `in regard to the delivery and reception of verdicts a different rule applies, as the rendering of a verdict is a mere ministerial act, and it is an act of necessity and charity to receive it, and not keep the jurors confined until Monday.'" 101 Miss. at 606-607, 58 So. at 219.
In State v. Foss, 158 La. 471, 104 So. 211 (1925), trial was begun on Friday and the taking of evidence was concluded on Saturday night at 11:20. Counsel for defendant stated to the court that he was eager to continue the trial. Whereupon, the prosecutor objected on the ground that if the trial proceeded and resulted in conviction that the continuation of the proceeding on Sunday might be urged as a ground for a new trial. Defense counsel gave his word that if the case were allowed to proceed no advantage would be taken of the fact that some of the proceedings had been held on Sunday. The case proceeded, with argument of counsel ending at 12:25 A.M. Sunday, at which time the jury was charged and the verdict was returned and recorded at 2:00 A.M., Sunday.
Appellate defense counsel (not the trial defense counsel) urged that these Sunday proceedings were void. In Foss, the Supreme Court of Louisiana held:
"An accused has no right to stand by and suffer proceedings to take place on a `statutory holiday,' and after verdict, in a motion to quash, ask to have the proceedings reversed on the ground that it was a holiday.
"The objection should not have been postponed until after verdict, nor urged for the first time in motion in arrest.
......
"Moreover, the proceedings on a statutory legal holiday are not necessarily null. They may be held on that day by consent. Besides, an accused may be concluded by his silence, if he chooses to *123 remain silent when he is represented by counsel amply able to protect his rights.
......
"An accused may waive his constitutional, statutory, or common-law rights, except when forbidden by some superior counter principle of law deemed necessary for his protection.
"There is no constitutional, statutory, or common-law principle which forbids an accused party from consenting to have his case argued, submitted, and determined by the jury and court on Sunday or a statutory legal holiday... . .
......

"There is no question of the waiver of jurisdiction in this case. The court and the jury were legally constituted, and were competent to try the issue of guilt or innocence between the state and the accused. The only question was whether the case should proceed to its conclusion on Sunday or be postponed to a future day.
"Whether a trial shall take place on one day rather than another can in no sense be said to affect the jurisdiction and competence of the court.
"The objection is purely technical and dilatory in its nature. If it had been made at the proper time, the case would have been delayed to another day, with the same result. The defendant has suffered no detriment caused by the continuance of the trial on Sunday.
"An accused party at whose instance and on whose persuasive promise a case has been continued and concluded on Sunday, and who took the chances of an acquittal, should not be permitted, after verdict of conviction, to challenge the regularity and legality of such proceedings.
"To ignore his request and promise to the court and district attorney whereby he gained a speedy determination of his case, and to set aside the verdict on the ground urged, would be a palpable miscarriage of justice, destroy the sanctity of the court, and make a mockery of judicial procedure.

"Our conclusion is that the prohibition of the continuance of the trial on Sunday of a case already begun does not affect the jurisdiction and competence of the court, and is not such as cannot be waived by an accused party." 158 La. at 475-478, 104 So. at 212-214. (Emphases added).
The judgment of the Circuit Court is affirmed.
Affirmed.
GILLESPIE, C.J., and PATTERSON, INZER and BROOM, JJ., concur.
INZER, Justice:

ON PETITION FOR REHEARING
The only assignment of error in the Petition for Rehearing is:
The Court did not fully consider the admissibility of the statement of appellant.
In her brief in support of her Petition for Rehearing, appellant quotes from Miranda v. Arizona, 384 U.S. 436, 444, 445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 707 (1966):

If, however, he indicates in any manner and at any stage of the process that he wishes to consult an attorney before speaking there can be no questioning.... If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with an attorney and have him present during any subsequent questioning. (Emphasis added).
In our original opinion, we discussed at length the two occasions on December 15, *124 1970, when appellant's Miranda rights were explained orally in detail, and when she signed two written waivers setting forth her rights in detail. We quoted the testimony of Lt. Reeves wherein he testified that on December 27, 1970, he again asked Mrs. Biddy if she understood her rights, and she replied that she understood them.
After a careful search of the record, we find that nowhere in this record does Mrs. Biddy, the appellant, request, indicate, hint or express a desire to speak with or consult an attorney; although she was well aware that an attorney was available. Nowhere in any shape, form or fashion does she express a desire to have an attorney present during any questioning, nor does her husband express any wish or desire to have an attorney present.
All statements that Mrs. Biddy made on December 27, 1970, were made freely and voluntarily and mostly on the solicitation of her husband.
Ted L. Biddy, the husband of appellant Carolee Biddy, testified for the defense on direct examination as follows:
Q. Then, if you remember, what did you say to Carolee or Detective Price or Reeves?
A. Well, I was up real close to her, I had her hands in mine, I was right up next to her. I told her, I says, "Honey, I've got something very serious to say to you now. They have told me that they have found no evidence that you were attacked that night, nor that Candace was abducted last night and they believe that you staged these as hoaxes."
Q. Go right ahead.
A. Well, she admitted that they were true by shaking her head affirmatively that she had. She was emotional, of course, during this. I then told her that there was something else that they had told me that I wanted to tell her and that was that they had told me that they had three witnesses who had seen a woman, fitting her description, walking around in a rose nightgown at the Main Harbor Marina on the night Mona disappeared.
Q. What did Carolee go on and say, what was her story?
A. Well, Lieutenant Reeves and Lieutenant Price started talking to her and asking her about it and she says, "Well, I said I did not go in to check on Mona before I went to bed but I did." She said that she had watched some TV program and had dozed off, it was 10:30 or 11:00 o'clock, and that she went in to check on her before going to bed and she couldn't see Mona in the bed. She said all she could see was a big fluffy pillow and she went over to get her out from under the covers; it was nothing unusual for Mona, she was a hyperactive child, and she would be a lot of times under the cover. No one could sleep with Mona because she was so hyperactive. She said that she went to get her out from under the covers and pull her up in the bed, straighten her up, and the covers were all twisted around her and that when she raised the covers up that it pulled Mona up with it and when the covers came off she fell back and she knew immediately something was wrong. She said she picked her up on her shoulder and took her into the den, laid her down on the couch with her head in her lap and checked her in every possible way, her breathing, her pulse, shaking her and finally realized that she was dead.
Q. What did she then tell the policeman that she did?
A. She said that she panicked. She said she could just see my ex-wife Ruth's face; that she knew she would be blamed. She said she started to come get me. She started to call the doctor but she could just see my ex-wife's face and that she panicked. And that she picked her up, put her in the front seat of our car; she said she drove and didn't know where *125 she was going but the next thing she remembers she was on the reservoir levee road and that she went to the area of the Lake View Marina, took her body out of the car, took her over to the edge of the bank on a grassy spot, laid her down, kissed her and drove back home. She said she couldn't remember anything about driving back home except that the car almost went out of control one time.
In summary, it is apparent from the record in this case that all of the constitutional rights of Mrs. Biddy had been fully explained to her, she fully understood them, and with this knowledge, she freely and voluntarily made the statements complained of, mostly at the solicitation of her husband. It is not contended that she was in any way coerced, threatened or made any promises by the officers. She never at any time expressed any desire to speak with or consult with the attorney with whom her husband conferred. Neither did she express any desire to consult with any other attorney or have an attorney present before she made any statement. A statement made under these circumstances certainly should be and is admissible in evidence.
For the reasons stated the petition for rehearing is denied.
All Justices concur.