# IN THE COURT OF APPEALS 03/11/97

# OF THE

# STATE OF MISSISSIPPI

## NO. 93-KA-01274 COA

CALVIN L. WILLIAMS

APPELLANT

 v.

 STATE OF MISSISSIPPI

APPELLEE

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. JOHN LESLIE HATCHER

COURT FROM WHICH APPEALED: BOLIVAR COUNTY CIRCUIT COURT

ATTORNEY FOR APPELLANT:

RAYMOND L. WONG

ATTORNEY FOR APPELLEE:

OFFICE OF THE ATTORNEY GENERAL

BY: DEWITT ALLRED, III

DISTRICT ATTORNEY: LAWRENCE Y. MELLEN

NATURE OF THE CASE: CRIMINAL - MURDER

TRIAL COURT DISPOSITION: GUILTY - SENTENCED TO LIFE IN THE CUSTODY OF THE
MISSISSIPPI DEPARTMENT OF CORRECTIONS

MANDATE ISSUED: 8/29/97

BEFORE BRIDGES, C.J., COLEMAN, AND DIAZ, JJ.

COLEMAN, J., FOR THE COURT:

A jury in the Circuit Court of Bolivar County found Calvin L. Williams (Williams) guilty of murder for the death of Elaine Sanders. The trial court sentenced him to life imprisonment in the custody of the Mississippi Department of Corrections. This Court resolves all four of Williams' issues in this appeal against him and affirms the trial court's judgment of Williams' guilt of murder and its sentence of life imprisonment.

## I. FACTS

Sometime around 7:30 a.m. on Thursday, February 11, 1993, Sanders got into a 1980 Mercury Cougar XR7 with Calvin L. Williams (Williams). They spent the remainder of what was to become Sanders' last day on earth driving around Bolivar County and smoking crack cocaine. Williams and Sanders purchased the crack with some of the eleven hundred dollars which Williams had on his person. Somewhere around three o'clock that afternoon Williams and Sanders stopped at an abandoned, isolated, and terribly deteriorated house located about two miles from the community of Malvina in Bolivar County. The nearest house was at least one or two miles distant. Once they had entered the house, Williams and Sanders began to smoke some more crack. An argument quickly ensued about some money which Williams accused Sanders of stealing from the car in which they had been riding. The argument erupted into a physical confrontation, from which Sanders' death ensued. Based on his autopsy, a forensic pathologist, Dr. Steven Hayne, opined at trial that blows to Sanders' head with a blunt object had caused her death. Dr. Hayne classified Sanders' death as a homicide.

In the meantime, Bolivar County Deputy Sheriff Billy Joe Estes, who served as an investigator with the Bolivar County Sheriff's Department, had been called to investigate an assault and possible robbery of a husband and wife, L. E. (Doc) Tyer, Sr., and Sybil Tyer, which occurred at their home and store, which was adjacent to their home, located in Malvina. Deputy Estes arrived at the Tyers' home between 2:30 and 3:00 p.m. on Thursday, February 11, the day of Sanders' death. A witness, Joe Garcia, told Estes that he had seen a "brown looking car . . . built kind of like a Thunderbird" pull up behind Doc Tyer's car when Tyer returned to his home. Garcia told Estes that he had seen a "tall, black person" get out of the "brown looking car," but he never saw that car leave the Tyers' home and near-by store. The "tall, black person" was the only person whom Garcia had seen in connection with the car "built kind of like a Thunderbird."

By radio Estes notified all the other deputies of the description of the car which might have been involved in the attack on the Tyers, and he directed various deputy sheriffs to come to the Tyers' home and store by different roads. Deputy Sheriff Charles Griffin responded to Estes' summons by driving his sheriff's patrol car west on the Mound Bayou road. Griffin had turned on the car's blue lights, which were flashing as he drove. When Griffin was about six or seven miles west of Mound

Bayou, he noticed that he was meeting "a brown -- a gold looking vehicle." When the driver of that car saw Griffin, he turned to the north in front of the approaching deputy sheriff's car and "just took off." Griffin had known Williams, and he recognized Williams as the driver of the car. Griffin began to pursue Williams with the car's blue lights flashing and its siren's wailing at speeds of up to seventy five miles per hour; but all to no avail. Griffin lost him.

Early that same night, the deputies found the 1980 Mercury Cougar, which Williams had been driving, flipped over in a ditch with the driver's-side window broken out. Inside the abandoned car, Estes discovered a bloody shirt and a small brass disk with the name "Tyer" on it. He also observed spots of what appeared to be blood on the car's steering wheel, the seat, and the passenger's door. Estes impounded the Cougar and arranged for it to be towed to the city's shop at Boyle in Bolivar County "to keep it out of the weather" because "[i]t looked like it was going to rain."

After Estes had secured the Cougar in the Boyle city shop, he and other deputies continued to search for Williams. Deputies were dispatched to Williams' home to await his return, but when he failed to return home that same night, the deputies continued their search on Friday morning, February 12. W. L. Crocker, the police chief for Shelby, Mississippi, and Bolivar County Deputy Sheriff Mike Thompson assisted Estes, who began to search for Williams in the churches in that area. At the first church, they found nobody; but at St. James Church, where the central heating unit was running, Estes went in while Chief Crocker and Deputy Thompson guarded the outside of the church. Estes had noticed that the back door of the church had been forced open and that a chair had been placed against it. When Estes entered the church alone, he found a pair of boots and some socks drying inside the building. He also found Williams hiding beneath a front pew around which trash cans and collection stands had been arranged. Williams was wearing Sanders' black jacket when Estes found him. Estes arrested Williams, read him his rights, and took Williams to the Bolivar County Sheriff's Office to question him about the attack on the Tyers. Estes did not know that Sanders had been killed when he found and arrested Williams.

Pursuant to Deputy Estes' interrogation of Williams about the Tyer assault and apparent robbery, Williams told Estes that he had been with Sanders the day before, Thursday, February 11, 1993. Because no one had seen Sanders since then, the deputies began to search for her. Deputies Estes and Murry Roark came to the abandoned house Williams and Sanders stopped in the day before, and noticed fresh tire tracks and mud on the steps to the house. Estes peered through a window and noticed blood stains on the floor and walls of the building. Upon their entering the abandoned structure, the deputies found Sanders' body covered by sheetrock and debris on the floor in what was once a bedroom of the deserted house. The two officers called in crime scene specialists with the Mississippi Highway Patrol to gather evidence from the house.

On February 13, 1993, Deputy Estes formally charged Williams with the murder of Sanders and read the *Miranda* rights to Williams in Deputy Estes' office. Two days later, on February 15, Williams signed a second statement and waiver of rights. The rights were read to Williams one more time at the beginning of the interrogation for the murder of Sanders. Williams gave a statement to the law enforcement officers about Sanders' death.

Eight days later, on February 23, Deputy Estes asked Mark Carpenter, a jailer at the Bolivar County Jail, to ask Williams, who had remained incarcerated in the Bolivar County jail since his arrest, what

he had done with the shirt he was wearing when Sanders was killed. During the trial court's hearing of Williams' motion to suppress all of his statements, Carpenter testified that he posed the following question about the shirt to Williams: "You probably won't tell me, but I'm going to ask anyway, what you did with the shirt you had on?" Carpenter then testified that Williams replied: "I threw it in a big hole in the floor of that old abandoned house [where Sanders had been killed]." Deputy Estes then dispatched Jailer Carpenter and Deputy Sheriff Charles McCool to search for the shirt pursuant to Williams' information. Carpenter and McCool found not only the shirt but also Sanders' shoes, which were located outside a window at the rear of the abandoned house.

We have already noted that the jury returned a verdict of "Guilty of murder," and that the trial judge sentenced him to the mandatory life imprisonment. We reserve our discussion of what occurred at Williams' trial for our review and resolution of the four issues which Williams had presented in his appeal of the trial court's judgment of his guilt of murder.

## II. ISSUES

In his brief, Williams presents to this Court for its review, analysis, and resolution the following four issues, which we quote verbatim from Williams' brief:

> 1. The trial court committed reversible error in failing to suppress the defendant's statement to Mark Carpenter on February 23, 1993, and the derivative evidence of the shirt and the subsequent serological analysis on the shirt in which the defendant's statement were taken without the defendant's having been warned of his rights as set forth in *Miranda v. Arizona,* 384 U.S. 436 (1964), and its progeny.
>
> 2. The trial court committed reversible error in failing to quash the jury venire when the defendant was brought into the court room on the date of his trial shackled.
>
> 3. The trial court committed reversible error in the granting of a flight instruction when the flight had been explained and the defendant had asserted self-defense.
>
> 4. The trial court committed error in denying Appellant's Motion For Directed Verdict because the prosecution failed to prove its case against the Appellant, and the verdict was against the overwhelming weight of the evidence, and the verdict evidences bias and prejudice against the Appellant, and was based solely upon suspicion and speculation.

## III. REVIEW, ANALYSIS, AND RESOLUTION OF THESE FOUR ISSUES

> **A. Issue 1** The trial court committed reversible error in failing to suppress the defendant's statement to Mark Carpenter on February 23, 1993, and the derivative evidence of the shirt and the subsequent serological analysis on the shirt in which the defendant's statement were taken without the defendant's having been warned of his rights as set forth in *Miranda v. Arizona,* 384 U.S. 436 (1964), and its progeny.

Williams makes no issue of the chain of custody of the shirt which is the subject of this issue, and, indeed, Williams admitted when he testified that he was wearing the shirt when the altercation between him and Sanders occurred. Debra Haller, a forensic serologist employed by the Mississippi Crime Laboratory, testified that she collected eleven different stains from this shirt at the crime lab in Jackson. Of these eleven stains, Haller concluded that four were of Blood Group A, Sanders' blood type. These four stains were on the following parts of the shirt: (1) the front collar area, (2) the front left shoulder, (3) the inside of the pocket located on the right chest area, and (4) the lower back. Other stains found on the center-chest area were composed of both type A and type B antigens. Because Haller determined that Williams' blood was type B, she concluded that this stain represented a mixture of both Sanders' and Williams' blood.

Also relevant to our review and resolution of this issue is that the record in this appeal demonstrates that during Williams' trial, the State never so much as mentioned Carpenter's question nor Williams' answer to Carpenter's query about what Williams had done with the shirt. Instead, the record reveals only that several days after Williams' arrest, Jailer Carpenter and Deputy McCool returned to the deserted, dilapidated house to resume searching for Williams' missing shirt. This time, they found the shirt.

The Fifth and Fourteenth Amendments to the United States Constitution and Article III, Section 26, of the Mississippi Constitution of 1890 protect the criminally accused from self-incrimination. *Neal v. State,* 451 So. 2d 743, 753 ( Miss. 1984), *cert. denied,* 469 U.S. 1098 (1984). In *Miranda v. Arizona,* 384 U.S. 436 (1966), the United States Supreme Court established the concept of warning a criminal suspect of his or her right against self-incrimination afforded by the Fifth Amendment to the Constitution and made operative against the states through the application of the Fourteenth Amendment to the Constitution. However, "[t]he mere giving of the *Miranda* warnings, no matter how meticulous, no matter how often repeated, does not render admissible any inculpatory statement thereafter given by the accused." *Jones v. State,* 461 So. 2d 686, 696 (Miss. 1984). Giving of the *Miranda* warnings is only the first step of a two-step process intended to protect the suspect's rights so that the State's compliance with that two-step process will render the suspect's confession admissible into evidence. *Id.* "To render the statement admissible the State must take the second step and prove that the rights of which the accused has been *Miranda*-warned were thereafter waived -- intelligently, knowingly and voluntarily." *Id.* (citation omitted). Williams assignment of error falls on the first step of the two-step process which *Miranda* analysis requires because he claims that the jailer, Mark Carpenter, did not again "*Mirandize*" him before he asked Williams what he had done with the shirt he was wearing when Sanders was slain.

It is true that the jailer did not read Williams his *Miranda* rights when he asked Williams what he had done with the shirt. Neither did the jailer ask Williams to sign a waiver of those rights. Yet there are two unrelated reasons, any one of which is sufficient, to resolve this first issue adversely to Williams.

The first reason begins with the recognition that the record contains as exhibits three separate statements and acknowledgments of rights, all of which Williams executed. Williams executed the first document on February 12, 1993, at 10:45 a. m. in the Bolivar County jail just after Deputy Estes arrested him at St. James Church. Above Williams signature to the acknowledgment of rights is this

sentence: "The above statement of my rights has been read and explained to me and I fully understand what my rights are." Deputy Billy Joe Estes signed the first document to indicate that he had advised Williams of his right against self-incrimination, and Deputy Murry Roark witnessed it. Williams executed the second document later on the same day, February 12, 1993, at 11:30 p.m. in the office of the Shelby police chief, W. L. Crocker. This second document was identical in form and content to the first document. Deputy Billy Joe Estes signed the second document to indicate that he had advised Williams of his right against self-incrimination, and Chief W. L. Crocker witnessed it. Williams executed the third document on February 13, 1993, at 3:20 p.m. in the Bolivar County jail after Deputy Estes and Deputy Roark had discovered Sanders' body earlier that day. This third document was identical in form and content to the first and second documents. Deputy Billy Joe Estes signed the third document to indicate that he had advised Williams of his right against self-incrimination, and both Chief Deputy Charles Anderson and Deputy H. M. "Mack" Grimmet witnessed it. Estes justified the third document because he had notified Williams that he, Williams, had been charged with murdering Sanders.

When the court conducted its hearing on Williams' motion to suppress the statements he had made to these deputies, the State called every witness to the various waivers and statements as we have named them, and all of them testified that Williams had freely and voluntarily executed all three of these waivers, or "acknowledgment[s] of rights," and that so far as they were able to observe, Williams understood the nature of his right against self-incrimination and the consequences of his waiver of that right. Williams did not testify for himself at the hearing to suppress, although he testified in his own behalf at his trial. In that testimony, Williams claimed the first statement was a lie and that he was under the influence of drugs when he gave that statement. Then, for the first time, Williams suggested that the deputies had coerced him into giving one or more of the statements. Williams explained that he "had to make up something just to get -- stop [Estes] from talking to me.

The United States Court of Appeals, Seventh Circuit, quoting the Illinois Supreme Court, has explicitly stated that once the *Miranda* requirement has been complied with and understood by the criminal suspect, subsequent readings of those rights are not required. The court wrote:

> It should be made clear that once Miranda's mandate was complied with at the threshold of the questioning it was not necessary to repeat the warnings at the beginning of each successive interview. To adopt an automatic second-warning system would be to add a perfunctory ritual to police procedures rather than providing the meaningful set of procedural safeguards envisioned by Miranda.

*United States v. Springer,* 460 F.2d 1344, 1353 (7th Cir. 1972) (citing *People v. Hill,* 233 N.E.2d 367, 371 (Ill. 1968), *cert. denied,* 392 U.S. 936 (1968)). A similar result was reached by the United States Court of Appeals, Ninth Circuit, when that court affirmed appellant's conviction in *Maguire v. United States*, 396 F.2d 327 (9th Cir. 1968), *cert. denied*, 393 U.S. 1099 (1969). In *Maguire*, a suspect was read his rights before he was interrogated by police. *Id*. at 331. However, he was not warned before a second interrogation held three days after the first. *Id.* That court wrote:

> Officer Hammond's warning, which was clearly adequate to meet the Miranda standards, came three days before the interrogation of appellant by Agent Turnage; thus, even if the warning given by Turnage was insufficient, the appellant could not claim he had not been

apprised of the Miranda warnings. Finding no error, we affirm.

*Id.*

Concerning a suspect's understanding of the *Miranda* warnings and the admissibility of a suspect's statements, the Mississippi Supreme Court opined:

> We think that this testimony was properly admitted. It is perfectly clear to us that Mrs. Biddy thoroughly understood her rights and that she had intelligently waived them, not once but twice in writing, and also several times orally. Even on December 27th, immediately before her statements she acknowledged that she understood her rights. There are no magic words that law officers must meticulously repeat each time they question a person.

*Biddy v. State,* 277 So. 2d 115, 120-121 (Miss. 1973) (citations omitted).

In *Upshaw v. State*, 350 So. 2d 1358, 1364 (Miss. 1977), the Mississippi Supreme Court provided a second and -- to this Court -- more compelling reason to resolve this issue against Williams. Upshaw had been convicted of the rape of a female less than twelve years of age and sentenced to death. *Id.* at 1359. The supreme court reversed Upshaw's conviction and remanded the case for a new trial because he had not been afforded a bifurcated trial. *Id.* at 1361. Because of the necessity of a new trial, the supreme court addressed other issues which Upshaw had raised in his initial appeal. *Id.* One of the issues which that court addressed was whether the removal of his clothes in jail after he had been arrested so that he could don a prisoner's uniform violated his right against self-incrimination. *Id.* Subsequent tests on Upshaw's personal clothing revealed the presence of semen, which obviously was consistent with his having had sexual intercourse. *Id.* The Mississippi Supreme Court opined that the seizure and examination of Upshaw's clothing did not violate his Fifth and Sixth Amendment rights. *Id.* The court explained:

> In *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed.2d 908 (1966) the United States Supreme Court held that the withdrawal of the accused's blood and the admission of the analysis report did not violate self-incrimination rights under the Fifth Amendment. The Fifth Amendment privilege against self-incrimination protects an accused from being compelled to testify against himself, that is, to provide evidence of a testimonial or communicative nature, but does not extend to the securing of real or physical evidence. *Gilbert v. California*, 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed.2d 1178 (1967); *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed.2d 1149 (1967); *Schmerber v. California, supra*.

> The United States Supreme Court, in *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S. Ct. 1642, 18 L. Ed.2d 782 (1967), held that the clothing involved in that case was not 'testimonial' or 'communicative' evidence and that the accused's Fifth Amendment right against self-incrimination was not violated by its introduction upon the trial of the accused.

*Id.* The supreme court then concluded: "It was not necessary for the officers to specifically inform [Upshaw] that any evidence found from an examination of his clothes could be used against him."*Id. Upshaw* demonstrates in the case *sub judice* that the shirt about which the jailer inquired of Williams was physical evidence to which the Fifth Amendment's protection against self-incrimination did not extend. Therefore it was unnecessary for "[Carpenter, the jailer] to specifically inform [Williams] that any evidence found from an examination of his [shirt] could be used against him." This Court therefore holds that trial court committed no error in failing to suppress Williams' answer to Mark Carpenter's question on February 23, 1993, concerning the whereabouts of the shirt and resolves this issue adversely to Williams.

> **Issue 2.** The trial court committed reversible error in failing to quash the jury venire when the defendant was brought into the court room on the date of his trial shackled.

Williams argues that the entire jury venire should have been quashed because he was brought into the court room with leg irons on his feet and a chain around his waist. He contends that because this was done in the presence of the entire jury venire, the presumption of his innocence was destroyed in the minds of the jury. Williams claims that this circumstance violated his common law right to be tried free from all shackles when in the presence of the jury. The trial court denied Williams' motion to quash the jury venire because it found that the jury could not see the chains. He opined that the jury could not see the chains because the chain around his waist was under his clothing; and his feet in the leg irons were hidden under the defense counsel's table. Williams' counsel also complained of the clanking noise which the chains made when the deputies brought Williams into the court room, but again the judge found on the record that he had heard no clanking at any time. Williams produced no witness who testified that he or she heard any clanking noise emanating from Williams' chains.

During argument on the motion to quash the jury venire, the trial judge inquired of Williams' counsel if he knew that his client was in chains when he asked the deputies to bring him into the court room? Williams' counsel replied affirmatively that he did know that his client was in chains, but that he assumed that the deputies would remove the chains before they brought him into the court room. Williams' counsel responded further to the trial judge's questions by admitting that he had not asked the deputies to remove the chains when they brought Williams into the court room. Williams, counsel had requested the deputies to bring Williams into the court room before the court had called his case for trial.

The law in Mississippi appears quite clear that a technical violation of the common law rule preventing the shackling of defendants while in the courtroom does not constitute grounds for reversal. The Mississippi Supreme Court case most often cited concerning this issue is *Rush v. State,* 301 So. 2d 297 (Miss. 1974), which is factually similar to the case *sub judice.* In *Rush,* the criminal defendant argued that his being exposed to the jurors in handcuffs denied him a fair trial. *Id.* at 300. The court wrote:

> It is a common-law right of a person being tried for the commission of a crime to be free

from all manner of shackles or bonds, whether of hands or feet, when in court in the presence of the jury, unless in exceptional cases where there is evident danger of his escape or in order to protect others from an attack by the prisoner. Whether that ought to be done is in the discretion of the court, based upon reasonable grounds for apprehension. But, if this right of the accused is violated, it may be ground for the reversal of a judgment of conviction.

The record reflects that all of the chains were removed from Williams at the first recess outside the view of the venire before voir dire of that venire had begun. The error of allowing Williams to enter the courtroom in the presence of the jury venire while restrained by chains which the trial judge found to be inconspicuous was at best a technical violation of the rule. Therefore, the events of which Williams complains in this issue are not sufficient on which to ground a reversal of the trial court's judgment of his guilt of the crime of murder. The following quotation from *Rush* is an appropriate conclusion for our resolution of this issue adversely to Williams:

Under the facts and circumstances of this case, we are of the opinion that the action of the [deputies] in bringing [Williams] into the courtroom in the presence of the prospective jurors while [shackled] did not result in any prejudice to his right to a fair trial.

*Id.* This Court affirms the trial judge's denial of Williams' motion to quash the jury venire on the grounds that he had been brought into the courtroom in shackles.

**Issue 3.** The trial court committed reversible error in the granting of a flight instruction when the flight had been explained and the defendant asserted self-defense.

Jury instruction S-2, the flight instruction about which Williams complains in his third issue, read as follows:

Flight is a circumstance from which guilty knowledge and fear may be inferred. If you believe from the evidence in this case beyond a reasonable doubt that the defendant, Calvin L. Williams, did flee or go into hiding, such flight or hiding is to be considered in connection with all other evidence in this case. You will determine from all the facts, whether such flight or hiding was from a conscious sense of guilt or whether it was caused by other things, and give it such weight as you think it is entitled to in determining the guilt or innocence of the defendant.

The record contains this objection which Williams' counsel made to Instruction S-2:

Your honor, we would object to S-2 as to flight. This is an argumentative instruction at best, and even the Defendant's own [testimony] as to why he ran was based on cocaine and not the murder.

Rule 5.03 of the which was in effect when this case was tried dealt with jury instructions in criminal cases. It provided:

> At the conclusion of the taking of testimony the attorneys shall dictate into the record their specific objections to the requested instructions and specifically point out the grounds for objection.

U.C.R.C.C.P. 5.03. Even before the adoption of the Uniform Criminal Rules of Circuit Court Practice, the Mississippi Supreme Court had required the litigant who objected to a jury instruction to make his objection specific. In *Collins v. State*, 368 So.2d 212, 212 (Miss. 1979), the supreme court explained:

> We have repeatedly pointed out that objections to instructions in the trial court must be specific so the trial judge has the opportunity to rule on the particular grounds relied on. This rule applies to objections to instructions in both civil and criminal trials.

Williams cites *Pannell v. State*, 455 So. 2d 785, 788 (Miss. 1984) in which the Mississippi Supreme Court reached a two part conclusion about the law of flight. The first conclusion was that "only unexplained flight . . . merits a flight instruction." *Id.* The second conclusion is that "a flight instruction is to be given only in cases wherein that circumstance has considerable probative value." *Id.* Williams then explains that he turned off the road and began to elude the sheriff's deputy because his crack cocaine and crack pipe were on the passenger seat next to him in the car. He argues that his explanation, which involves an obvious violation of Mississippi's criminal statutes, is sufficient reason for this Court to reverse and remand this case. This Court summarily rejects this argument; otherwise, it would tacitly approve of Williams' admitted violation of the criminal law. Williams' argument on the matter of explanation offers nothing to explicate Deputy Sheriff Estes' finding him hiding in the St. James Church.

Williams second argument to support his position on his third issue is that because there was evidence that he killed Sanders in self-defense, the trial judge erred by granting this Instruction S-2. However, his objection to Instruction S-2, which we earlier quoted in full, contains no mention of his having acted in self-defense. The State relies on this omission to argue -- we think correctly -- that this Court can consider only those objections which the record reflects that Williams made. Williams acknowledges the force of the State's argument by responding in his reply brief:

> The objection as stated by the defense thus preserved the error for review by this Court since self-defense was the main theory of defense [to] the homicide.

By italicizing them, he emphasized the words "not the murder" found at the conclusion of his objection to justify his contention that his objection at least implied this second ground.

Williams rests his argument on the recent case of *Banks v. State,* 631 So. 2d 748, 751 (Miss. 1994),

in which the Mississippi Supreme Court opined: "Where the defendant is arguing self-defense, a flight instruction should be automatically ruled out and found to be of no probative value." In *Banks,* the appellant was found guilty of aggravated assault after an altercation in a parking lot. *Id.* at 749. Banks stabbed Dennis Thompson with a knife after Thompson threatened to shoot him. *Id.* Subsequently, Banks fled the scene after Thompson and another man in the parking lot again threatened Banks' life. *Id.*

However, there is a very profound difference between the facts in *Banks* and in the case *sub judice*. The difference is that in *Banks*, the victim, Dennis Thompson, was stabbed but did not die. *Id.* at 748. In fact, both Banks, the appellant, and Thompson, the victim, fled from the scene of the stabbing. In the case *sub judice*, Elaine Sanders, the victim, was killed. In *Banks*, the supreme court elaborated on the victim's survival of the defendant's attack:

> Where the person against whom self defense has been exercised is still alive and has the back up support of other persons, flight seems logical and necessary. In other words, in the present case it would seem to have been illogical for Banks not to run.

*Id.* at 751. In *Banks*, the supreme court specifically found that "Banks' flight was amply explained. He was leaving based on threats from Patrick and on the alleged danger from the victim Dennis."*Id.* In the case *sub judice*, this Court has summarily rejected Williams' admission that he did not want to be caught violating the criminal law by possessing crack cocaine and paraphernalia for its use as a satisfactory explanation for his evading Deputy Charles Griffin.

In the case *sub judice,* Williams' claim of self-defense arose because Sanders threatened him with a brick, in response to which threat, he picked up a stick and struck Sanders "five or six" times about her head. He then threw the stick in some ditch after he left the house in which the altercation occurred. Williams' flight and hiding in the church from the law enforcement officers appears unrelated to his claim that he repeatedly struck Sanders in self-defense. Therefore, this Court rejects Williams' argument that *Banks* is appropriate precedent on which to place the trial judge in error for his having granted Instruction S-2. Thus, we resolve this issue adversely to Williams and affirm the trial court's grant of Instruction S-2.

> **Issue 4.** The trial court committed error in denying Appellant's Motion For Directed Verdict because the prosecution failed to prove its case against the Appellant, and the verdict was against the overwhelming weight of the evidence, and the verdict evidences bias and prejudice against the Appellant, and was based solely upon suspicion and speculation.

This Court quotes in full Williams' argument to support his motion for a directed verdict which he made when the State rested:

> Your Honor, at this time the Defense moves for a directed verdict on the charges set forth in the indictment, [cause number] 6480. The State has failed to prove a prima facie case of

deliberate design murder in this case, that they should have shown a death but not that my client has killed this individual with the deliberate design to effect death.

After the State rested on rebuttal, Williams offered for the trial judge's consideration a peremptory instruction to find him not guilty, which the trial judge denied. We think that the following portion of his argument in support of his peremptory instruction is a fair representation of that argument:

> Your Honor, the Defendant is the only one that was present at the homicide. His version of the facts as to how the homicide happened, based on Weathersby, must be accepted as true unless contradicted in material particulars by credible witnesses or witnesses for the State or by the physical facts or by the facts of common knowledge. We state that there has been no major contradiction and his version is self-defense on that aspect, and that he should be given a directed verdict or a peremptory instruction.

The trial judge refused to grant the peremptory instruction because he found that Williams' version of the events which culminated in Elaine Sanders' death was contradicted not only by his own statement but by the physical facts as well.

In his Motion for JNOV or in the alternative motion for new trial, Williams preserved his right to present his fourth issue to this Court in the following paragraph:

> The verdict of the jury was against an overwhelming weight of the evidence; and further that the State of Mississippi failed to prove a prima facie case as charged in the indictment.

We have quoted all of the foregoing to demonstrate that except for his reference to the *Weathersby* Rule in his argument to support the granting of a peremptory instruction of not guilty, Williams utterly failed to argue specifically any evidence or lack of evidence to support the trial court's granting of his motion for directed verdict or motion for JNOV or, in the alternative, new trial.

In fact, Williams acknowledges in his brief that because he related conflicting versions of the circumstances of Sanders' death to law enforcement officials, the *Weathersby* Rule cannot apply to his requested peremptory instruction. *Blanks v. State*, 547 So. 2d 29, 33 (Miss. 1989) (Weathersby Rule has no application "where the accused, following the slaying, gives conflicting versions of how the killing took place, or initially denies the act.) Williams first told Deputy Estes that he had let Sanders and another man out at the abandoned house, but later admitted that he was in the house when she "just fell dead" shortly after their scuffle, during which he admitted that he had struck her with a stick.

Williams' argument confuses and merges the distinct concepts of "sufficiency of the evidence" and "weight of the evidence." First, we deal with the sufficiency of the evidence, which is challenged by

motions for directed verdict and for judgment JNOV. *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993). With regard to the legal sufficiency of the evidence, all credible evidence consistent with the defendant's guilt must be accepted as true and the State must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence. *Id.* This Court will, "reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." *Id.*

The evidence against Williams, taken in the light most favorable to the State, would allow reasonable and fair-minded jurors to find Williams guilty of the murder of Elaine Sanders. Williams' own testimony established that he hit her in the head "five or six times" with a stick which he threw into a ditch when he left the house after he knew she was dead. We quote the following snippet of the State's cross-examination of Williams about the cause of Sander's death:

Q. All right. So you admit killing her?

A. I admit hitting her.

Q. You admit hitting her

A. Yes.

Q. -- and as a result of that she died --

A. Yes.

Q. -- while you were there?

A. Yes.

Q. That's killing her, isn't it?

A. I don't know what you want to call it.

Q. Well, what do you call it?

A. I would say that I was the cause of it, yes.

The forensic pathologist, Dr. Steven Hayne, opined without objection that Sanders' death was a homicide and that cerebral trauma which caused bleeding over the surface of Sanders' brain and multiple areas of bleeding within her brain caused her death. He further opined without objection that the injuries to Sanders' hands and fingers were consistent with "defensive posturing injuries," which a person who was trying to defend herself would sustain. The trial judge instructed the jury about Williams' claim of self defense, but they rejected his claim that he had acted in self-defense when he struck Sanders "five or six times" about the head. This Court, after a review of the complete record, finds that the State's evidence was sufficient to support the jury's verdict of Williams' guilt of Sanders' murder.

Motions for a new trial challenge the weight of the evidence and "[implicate] the trial court's sound

discretion." *McClain,* 625 So. 2d at 781. New trial decisions rest within the discretion of the trial court. *Id.* A motion for new trial should only be granted when the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice. *Wetz v. State,* 503 So. 2d 803, 812 (Miss. 1987). This Court will reverse the trial court and order a new trial only upon a determination that the trial court abused its discretion, accepting as true all evidence favorable to the State. *McClain,* 625 So. 2d at 781.

In the absence of Williams' explanation of why the trial judge abused his discretion in denying his motion for a new trial, we conclude that the jury's verdict of "Guilty of Murder" was hardly contrary to the overwhelming weight of the evidence and that this Court would commit an unconscionable injustice were it to sustain Williams' motion for a new trial. We therefore affirm the trial court's denial of Williams motion for judgment JNOV or, in the alternative, new trial.

## IV. SUMMARY

Williams contends that the trial court's judgment of his guilt of the murder of Elaine Sanders resulted from the trial court's: (1) failing to suppress the shirt which the deputies found as the result of Williams' informing them where he threw it in the house, (2) failing to quash the jury venire because he was brought into the courtroom in shackles while the venire was also inside it, (3) granting the State's "flight" instruction, and (4) denying his post-trial motion for JNOV or, in the alternative, new trial. We hold that his arguments on all these issues fail. Williams was fully appraised of his legal rights prior to his response to the jailer's question about what he had done with the shirt while in the Bolivar County jail; but even had he not been fully apprised of his rights when he answered the question, the State's obtaining physical evidence such as the shirt cannot violate a defendant's right against self-incrimination. We defer to the trial judge's finding that the deputies' bringing Williams into the courtroom in shackles was a *de minimis* violation of the common law rule that defendants be free from all restraints while in the courtroom, especially since the record reflects no evidence of prejudice to Williams by that act. We have noted that the shackles were unobtrusively removed from Williams' body at the first recess so that at no time after the trial judge called his case for trial did Williams appear in shackles in the courtroom. The State's flight instruction was properly granted by the trial court based on evidence of Williams' eluding the deputy sheriff who was pursuing him and Williams' subsequent hiding in a church. Finally, the evidence against Williams was more than sufficient to convict him of murder, and the jury's verdict of his guilt of the murder of Elaine Sanders was hardly against the great weight of the evidence. Thus, the trial court correctly denied Williams' motion for JNOV or, in the alternative, a new trial. Thus, this Court affirms the trial cou rt's judgment of Calvin L. Williams' guilt of murder in the death of Elaine Sanders on February 11, 1993, and its sentence of Williams to serve a life sentence in the custody of the Mississippi Department of Corrections.

**THE BOLIVAR COUNTY CIRCUIT COURT'S JUDGMENT OF THE APPELLANT'S GUILT OF THE CRIME OF MURDER AND ITS SENTENCE TO SERVE A TERM OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ARE AFFIRMED. SENTENCE IMPOSED SHALL RUN CONSECUTIVELY TO ANY AND ALL SENTENCES PREVIOUSLY IMPOSED. COSTS ARE TAXED TO BOLIVAR COUNTY.**

**BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., DIAZ, HERRING, KING, PAYNE, AND SOUTHWICK, JJ., CONCUR.**